**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
1990 North California Boulevard, Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-Mail: ltfisher@bursor.com

**BURSOR & FISHER, P.A.**
Joseph I. Marchese (*Pro hac vice* forthcoming)
888 Seventh Avenue, Third Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: jmarchese@bursor.com

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOLANDA BROUSSARD-JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SAN FRANCISCO FEDERAL CREDIT UNION,<br><br>Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff Yolanda Broussard-Johnson, ("Plaintiff"), individually and on behalf of all others similarly situated, brings this Class Action Complaint ("Complaint") against Defendant San Francisco Federal Credit Union ("SFFCU" or "Defendant"), based upon personal knowledge with respect to herself, and on information and belief and the investigation of counsel as to all other matters, in support thereof alleges as follows:

## INTRODUCTION

1.    Defendant SFFCU wrongfully and unlawfully charged Plaintiff and the class members Overdraft fees and Non-Sufficient Funds/Return Item[1] fees ("NSF Fees") in breach of its contracts with its customers.

2.    This is a civil action seeking monetary damages, restitution, and injunctive and declaratory relief from Defendant SFFCU ("SFFCU") arising from its unfair and unconscionable assessment and collection of Overdraft fees and NSF Fees in breach of SFFCU's contracts with its customers.

3.    At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, SFFCU immediately decrements consumers' checking accounts for the amount of the purchase and sets aside funds in the checking account to cover that specific transaction.  As a result, and with limited exceptions, customers' accounts always have sufficient available funds to cover these transactions throughout their entire life-cycle.

4.    However, SFFCU still assesses $25-$30 Overdraft and NSF Fees on many of these transactions, in violation of its contractual promises not to do so.

**A.    SFFCU Breaches Its Contracts With Customers By Charging Overdraft Fees On "Authorize Positive, Purportedly Settle Negative" Transactions**

5.    Despite putting aside sufficient available funds for debit card transactions, SFFCU charges Overdraft fees on those same transactions if they purportedly settle—days later—into a negative balance ("Authorize Positive, Purportedly Settle Negative Transactions" or "APPSN

---

[1] Banks use the terms "NSF fees" and "return fees" interchangeably.  *See* https://topclassactions.com/lawsuit-settlements/lawsuit-news/891624-why-do-banks-charge-a-returned-item-fee/.  This complaint does the same, but attempts to mirror whatever language SFFCU uses when referring to specific transactions.

Transactions").

6.    SFFCU maintains a running account balance in real time, tracking funds consumers have for immediate use.  This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instant they are made.  When a customer makes a purchase with a debit card, SFFCU sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's account balance.  Such funds are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

7.    Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

8.    That means when any subsequent, intervening transactions are initiated on a checking account, they are compared against an account balance that has been reduced to account for earlier debit card transactions.  As such, many subsequent transactions incur Overdraft fees due to the unavailability of the funds sequestered for those debit card transactions.

9.    Still, despite keeping those held funds off-limits for other transactions, SFFCU improperly charges Overdraft fees on APPSN Transactions—the latter of which always have sufficient available funds to be "covered."

10.    Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "deceptive" when:

> [A] financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of

1

2

3

4

5

6

7

8

9

10

11

12

13

14

a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing the fees under these circumstances was found to be unfair.

15

16

17

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

https://files.consumerfinance.gov/f/201503_cfpb_supervisory-highlights-winter-2015.pdf (last

visited January 13, 2021).

18

19

20

21

22

23

24

11.     There is no justification for these practices other than to maximize SFFCU's

Overdraft fees revenue.  APPSN Transactions only exist because intervening checking account

transactions supposedly reduce an account balance.  SFFCU is free to protect its interests and either

reject those intervening transactions or charge Overdraft fees on those intervening transactions—

and it does the latter to the tune of millions of dollars each year.  But SFFCU was not content with

these millions in Overdraft fees.  Instead, it sought millions more in Overdraft fees on APPSN

Transactions.

25

26

27

28

12.     Besides being deceptive, unfair, and unconscionable, these practices breach contract

promises made in the SFFCU's adhesion contracts—contracts which fundamentally misconstrue the

true nature of the SFFCU's processes and practices.  These practices also exploit contractual

discretion to gouge consumers.

13.     In plain, clear, and simple language, SFFCU's deposit account agreement promises that the SFFCU will only charge Overdraft fees on transactions with insufficient funds to "cover" a given transaction:

> An overdraft occurs when you do not have enough available funds in your account to cover a transaction but we pay it anyway.  [If SFFCU pays the overdraft, the customer will be charged] $30 per item.

Ex. A, SFFCU's "Overdraft Privilege Notice and Opt In Form."

14.     But for APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet SFFCU assesses Overdraft fees on them anyway.

15.     Moreover, SFFCU reaffirms that debit cards transactions are "authorize[d]" and "pa[id]" immediately, in one fell swoop:

> If a check (share draft), ACH payment (debit), VISA Debit Card PIN or signature purchase or cash advance transaction, Preauthorized Transfer or Online Bill Payment is presented for payment on your checking account when you do not have available funds to cover it, the Credit Union … will charge the [Overdraft or NSF Fee] per item paid or returned, up to the daily maximum per transaction type.

Ex. B, SFFCU's "Member Account Handbook."

> We do not authorize and pay overdrafts for … [e]veryday debit card transactions on debit cards we issue … unless you ask us to.

Ex. A, SFFCU's "Overdraft Privilege Notice and Opt In Form."

16.     This promise indicates that transactions are only overdraft transactions when they are "authorized" and "paid" into a negative balance.  Of course, that is not true for APPSN transactions.

17.     Lest there be any doubt, SFFCU also clarifies that "authorization" and "pay[ment]" are a linked and essentially coterminous process—in other words, that authorization necessitates payment, and account balances are deducted once for any given transaction.  Specifically, SFFCU states that "[i]f we do not authorize and pay an overdraft, your transaction will be declined." *Id.*

18.     In fact, SFFCU actually "authorizes" transactions on positive funds, sets those funds aside on a hold, then fails to use those same funds to "pay" those same transactions when they settle.

19.    All these representations and contractual promises are thus untrue.  In fact, SFFCU charges Overdraft fees even when sufficient funds exist to "cover" transactions that are "authorized and pa[id]" into a positive balance.  *Id.*

20.    Counterintuitively, this means SFFCU actually debits an account twice for the same transaction—not just at the moment of purchase, but later during a hidden posting process described below.

21.    SFFCU breaches these plain contractual promises when it assesses Overdraft fees on APPSN Transactions that did have funds to cover them throughout their lifecycle.  By definition, there are always available funds sufficient to "cover" debit card transactions authorized into positive funds, for the simple reason that those funds are sequestered at the instant of authorization (as described above).

22.    The contract also fundamentally misconstrues the process by which Overdraft fees are determined—and, more generally, how debit card transactions are executed.

23.    In short, SFFCU is not authorized by contract to charge Overdraft fees on APPSN Transactions, but it has done so and continues to do so, to the tune of millions of dollars in consumer harm every year.

24.    This practice breaches SFFCU's contracts.

**B.    SFFCU Breaches Its Contracts With Customers By Charging Multiple Non-Sufficient Funds/Return Item Fees On The Same Transaction**

25.    But SFFCU's reprehensible behavior does not stop there.  SFFCU also participates in the unlawful business practice of imposing multiple Non-Sufficient Funds/Return Item Fees ("NSF Fees") on the same transaction.

26.    SFFCU documents permit SFFCU to charge a single $30 NSF Fee when it determines a customer's account contains insufficient funds to pay a transaction and it rejects the charge.  *See* Ex. A, SFFCU's "Overdraft Privilege Notice and Opt In Form."

27.    Through the imposition of NSF Fees, SFFCU makes millions of dollars annually often at the expense of its most vulnerable customers.

28.    Even if SFFCU had a right to reject the transaction and charge a single NSF Fee,

SFFCU unlawfully maximizes its already profitable NSF Fees with deceptive practices. These practices violate the express terms of its contract, which states, "We do not "structure" posting of items presented for payment to maximize paid or returned NSF fees."[2]

29.    SFFCU breaches this contractual promise by unlawfully assessing multiple NSF Fees on a single transaction or check.

30.    Unbeknownst to consumers, each time SFFCU reprocesses a transaction or check for payment after it was initially rejected for insufficient funds, SFFCU chooses to treat it as a new and unique item or transaction that is subject to yet another NSF Fee. But SFFCU's account documents never disclose that this counterintuitive and deceptive result could be possible and, in fact, suggest the opposite.

31.    SFFCU's account documents indicate that only a single NSF Fee will be charged per "transaction" or "item," however, many times that item is reprocessed with no request from the customer to do so. An electronic item reprocessed after an initial return for insufficient funds, especially through no action by the customer, cannot and does not fairly become a new, unique item for fee assessment purposes. This is particularly true here, where SFFCU reprocesses the items knowing there are insufficient funds, and thus does so solely to cause additional fees and increase SFFCU's profits at the expense of its customers.

32.    SFFCU breaches its contract when it charges more than one $25-$30 NSF Fee on the same item, since the contract explicitly states—and reasonable consumers understand—that the same item can only incur a single NSF Fee.

33.    This practice breaches SFFCU's contracts with Plaintiff and the putative classes and subclasses.

## PARTIES

34.    Plaintiff Yolanda Broussard-Johnson is a resident of Henderson, Nevada. While a resident of San Francisco, California, Plaintiff established a checking account with SFFCU. Plaintiff has maintained this account with SFFCU for the past several years.

---

[2] Ex. B, SFFCU's "Member Account Handbook." 17.

35.    Defendant SFFCU is a Credit Union with its principal place of business in San Francisco, California. Among other things, SFFCU is engaged in the business of providing retail banking services to consumers, including Plaintiff and members of the putative classes and subclasses, throughout multiple states.

<u>**JURISDICTION AND VENUE**</u>

36.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332(d)(2), because the matter in controversy exceeds $5,000,000, exclusive of interest and costs, and is a class action in which at least one member of each of the Classes is a citizen of a State different from the Defendant. The number of members of the proposed Classes and Subclasses in aggregate exceeds 100 accountholders. 28 U.S.C. § 1332(d)(5)(B).

37.    This Court has personal jurisdiction over the Defendant because Defendant maintains their principal place of business in California and in this District.

38.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because Defendant maintains their principal place of business in this District.

<u>**FACTUAL BACKGROUND AND GENERAL ALLEGATIONS**</u>

39.    Plaintiff has a checking account with SFFCU.

40.    SFFCU issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

41.    Pursuant to its standard account agreement, SFFCU charges Overdraft fees (at all materials times in the amount of $25-$30) for transactions that purportedly result in an overdraft.

**A.    Mechanics Of A Debit Card Transaction**

42.    A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from the SFFCU. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to SFFCU, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

43.     At this step, if the transaction is approved, SFFCU immediately decrements the funds in a consumer's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

44.     Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

45.     Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.  This is referred to in the banking industry as "posting" or "settling"—something which may occur several days after the transaction was initially initiated.

46.     There is no change—no impact whatsoever—to the available funds in an account when posting or payment of a transaction that settles in the same amount for which it authorized occurs.  That is because available funds amounts do not change for debit card transactions that settle in the same amount for which they were authorized.

**B.     SFFCU Account Documents**

47.     Plaintiff's checking account with SFFCU was, at all relevant times, governed by SFFCU's standardized contract for deposit accounts, the material terms of which are drafted by SFFCU, amended by SFFCU from time to time at its convenience and complete discretion, and imposed by SFFCU on all of its customers.

48.     The checking account contract documents covering Overdraft fees promise that the SFFCU will only charge Overdraft fees on transactions with insufficient funds to "cover" a given transaction:

> If a check (share draft), ACH payment (debit), VISA Debit Card PIN or signature purchase or cash advance transaction, Preauthorized Transfer or Online Bill Payment is presented for payment on your checking account when you do not have available funds to cover it, the Credit Union … will charge the Paid NSF fee (sometimes called the "clearing fee") or the Returned NSF Fee for that item stated in the Fee Schedule, per item paid or returned, up to the daily maximum per transaction type.

Ex. B.

49.    The critical contract term "to cover" is never defined.

50.    For APPSN transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to "cover" those transactions—yet SFFCU assesses Overdraft fees on them anyway.

51.    Moreover, SFFCU reaffirms that debit card transactions are "authorize[d] and pa[id]" immediately, in one fell swoop:

> An overdraft occurs when you do not have enough available funds in your account to cover a transaction but we pay it anyway … We do not authorize and pay overdrafts for … [e]veryday debit card transactions on debit cards we issue. We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transactions, even if you have opted in. If we do not authorize and pay an overdraft, your transaction will be declined.

Ex. A.

52.    This promise also indicates that transactions are only Overdraft fee transactions when they are "authorize[d]" into a negative balance.  Of course, that is not true for APPSN transactions.

53.    In fact, SFFCU actually "authorize[s]" transactions on positive funds, sets those funds aside on a hold, then fails to use those same funds to "pay" those same transactions when they settle.  Instead, it uses a secret posting process described below.

54.    All these representations and contractual promises are thus untrue.  In fact, SFFCU charges Overdraft fees even when sufficient funds exist to "cover" transactions that are "authorized and approved" into a positive balance.

55.    No express language in any document states that SFFCU may impose fees for overdrafts on APPSN Transactions.

**C.    The Account Documents Misrepresent SFFCU's True Overdraft Fee and Debit Processing Practices**

56.    The account documents misrepresent SFFCU's true debit card processing, Overdraft fee, and NSF Fee practices in at least three ways.

57.    First, SFFCU charges Overdraft fees on debit card transactions for which there are sufficient available funds to "cover" the transactions.  That is despite contractual representations that the SFFCU will only charge Overdraft fees on transactions with insufficient available funds to "cover" a given transaction.

58.    SFFCU assesses Overdraft fees on APPSN Transactions that do have sufficient available funds to "cover" them throughout their lifecycle.

59.    Those available funds are sequestered at the moment a debit card transaction is approved by SFFCU.

60.    SFFCU's practice of charging Overdraft fees even where sufficient available funds exist to "cover" a transaction violates a contractual promise not to do so.  This discrepancy between SFFCU's actual practice and the contract causes consumers like Plaintiff to incur more Overdraft fees than they should.

61.    Second, sufficient funds for APPSN Transactions actually are debited from the account immediately, consistent with standard industry practice.

62.    Because these withdrawals take place upon initiation, then should not be re-debited later.  But that is what SFFCU does when they re-debit the account during a secret batch posting process.

63.    In reality, SFFCU's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and at the time of settlement.  Then SFFCU makes that determination again, at settlement.

64.    At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds.  As such, SFFCU cannot then charge an Overdraft fee on such a transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    10

65.     At the moment a debit card transaction is getting ready to settle, SFFCU does something new and unexpected, during the middle of the night, during its nightly batch posting process.  Specifically, SFFCU releases the hold it had placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

66.     This furtive step allows SFFCU to charge Overdraft fees on transactions that it agreed not to—transactions that were authorized into sufficient funds, and for which SFFCU specifically set aside money to pay them.

67.     <u>Third</u>, as previously described, SFFCU charges multiple NSF Fees for single transactions despite the fact that the account documents say SFFCU will charge only one NSF Fee per transaction.

68.     These discrepancies between SFFCU's actual practices and the contract causes consumers to incur more Overdraft and NSF Fees than they should.

69.     In sum, there is a wide gap between SFFCU's practices as described in the account documents and SFFCU's practices in reality.

**D.      SFFCU Abuses Contractual Discretion By Assessing Overdraft Fees On APPSN Transactions**

70.     SFFCU's treatment of debit card transactions to charge Overdraft fees is not simply a breach of the express terms of the account documents.  In addition, SFFCU exploits contractual discretion to the detriment of accountholders when it uses these policies.

71.     The term "to cover" a transaction is undefined.  SFFCU uses its discretion to interpret "to cover" in a manner contrary to any reasonable, common sense understanding of that term.  In SFFCU's interpretation, a transaction is not "covered" even if SFFCU sequesters sufficient available funds for that transaction.

72.     Moreover, SFFCU uses its contractual discretion to cause APPSN Transactions to incur Overdraft fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

73.     SFFCU unfairly uses all of these contractual discretion points to extract Overdraft fees on transactions that no reasonable consumer would believe could cause Overdraft fees.

---

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED                                    11

1

**E.    Consumers Understand Debit Card Transactions Are Debited Immediately**

2        74.    The assessment of Overdraft fees on APPSN Transactions is fundamentally

3  inconsistent with immediate withdrawal of funds for debit card transactions.  That is because if

4  funds are immediately debited, they cannot be depleted by intervening transactions (and it is that

5  subsequent depletion that is the necessary condition of APPSN Transactions).  If funds are

6  immediately debited, then they are necessarily applied to the debit card transactions for which they

7  are debited.

8        75.    SFFCU was and is aware that this is precisely how its accountholders reasonably

9  understand debit card transactions to work.

10        76.    SFFCU knows that many consumers prefer debit cards for these very reasons.

11  Consumer research indicates that consumers prefer debit cards as a budgeting device because they

12  do not allow debt like credit cards do, and because the money comes directly out of a checking

13  account.[3]

14        77.    Consumer Action, a national nonprofit consumer education and advocacy

15  organization, advises consumers determining whether they should use a debit card that "[t]here is no

16  grace period on debit card purchases the way there is on credit card purchases; the money is

17  immediately deducted from your checking account.  Also, when you use a debit card you lose the

18  one or two days of 'float' time that a check usually takes to clear."[4]

19        78.    Further, Consumer Action informs consumers that, "Debit cards offer the

20  convenience of paying with plastic without the risk of overspending.  When you use a debit card,

21  you do not get a monthly bill.  You also avoid the finance charges and debt that can come with a

22  credit card if not paid off in full."[5]

23
————————————

24  [3] *See* https://www.chime.com/blog/why-debit-cards-are-the-best-for-budgeting/ (last accessed
   November 18, 2020).

25  [4] *See* https://www.consumer-
26  action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card (last visited
   November 18, 2020).

27  [5] *See* https://www.consumer-action.org/english/articles/understanding_debit_cards (last visited
   November 18, 2020).

28

79.    This is a large part of the reason that debit cards have risen in popularity.  The number of terminals that accept debit cards in the United States has increased drastically from 2011 onward, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM."[6]

80.    Not only have consumers increasingly substituted from cash to debit cards, but they believe that a debit card purchase is the functional equivalent to a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

81.    SFFCU was aware of a consumer perception that debit card transactions reduce an available balance in a specified order—namely, the order the transactions are actually initiated— and its account agreement only supports this perception.

**F.  The Imposition Of Multiple NSF Fees On A Single Transaction Violates SFFCU's Express Promises And Representations**

82.    SFFCU's account documents provide the general terms of Plaintiff Broussard-Johnson's relationship with the Credit Union and therein SFFCU makes explicit promises and representations regarding how transactions will be processed, as well as when NSF Fees may be assessed.

83.    The Member Account Handbook does not define the term "item" and never states the same "item" or "transaction" can cause multiple NSF Fees.

84.    Instead, the Member Account Handbook contains explicit terms indicating that NSF Fees will only be assessed once per transaction or item – defined as a customer request for payment or transfer – when in fact SFFCU regularly charges two or more NSF Fees per item even though a customer only requested the payment or transfer once.

85.    SFFCU's account documents indicate that a singular NSF Fee can be assessed on checks, automated clearing house (ACH) debits, and electronic payments.

86.    SFFCU's account documents state that it will charge $25 per item that is returned

---

[6] Maria LaMagna, Debit Cards Gaining on Case for Smallest Purchases, MARKETWATCH, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23

1    due to insufficient funds.  *See* SFFCU's "Schedule of Fees and Charges", attached hereto as Exhibit

2    C.

3         87.    According to SFFCU's Member Account Handbook a <u>single</u> fee will be assessed

4    when a check or debit item is returned.

5              We will charge the Paid NSF fee (sometimes called the "clearing fee") or the

6              **Returned NSF Fee for that item** stated in the Fee Schedule, **per item** paid or

              **returned.**

7    Ex. B. (emphasis added)

8         88.    While "item" is not defined, the same instruction for payment on an account cannot

9    conceivably become a new "item" each time it is rejected for payment then reprocessed, especially

10   when, as here, Plaintiff took no action to resubmit it.

11        89.    There is zero indication in the account documents that the same "item" is eligible to

12   incur multiple NSF Fees.

13        90.    An "item," like a check or ACH transaction, is a request for payment by an

14   accountholder.  It does not become a new "item" when it is later reprocessed by SFFCU.

15        91.    Even if SFFCU reprocesses an instruction for payment, it is still the same "item."

16   SFFCU's reprocessing is simply another attempt to effectuate Plaintiff Broussard-Johnson's

17   original order or instruction.

18        92.    The disclosures identified above never discuss a circumstance where SFFCU may

19   assess multiple NSF Fees for a single check or other item that was returned for insufficient funds

20   and later reprocessed one or more times and returned again.

21        93.    Because Plaintiff Broussard-Johnson only made one authorization for payment for

22   her "item," there is no new "item" when that transaction is rejected then automatically reprocessed

23   for payment by SFFCU.

24        94.    In sum, SFFCU promises that at most one $25 NSF Fee will be assessed per

25   (electronic payment, check, ACH debit, or debit) "item," and those terms must mean all iterations of

26   the same instruction for payment.  As such, SFFCU breached the contract when it charged more

27   than one NSF Fee per item.

28

---

95.    Reasonable consumers understand any given authorization for payment to be one, singular "item" as those terms are used in SFFCU's account documents.

96.    Taken together, the representations and omissions identified above convey to customers that all submissions for payment of the same item will be treated as the same "item" which the Credit Union will either authorize (resulting in an overdraft item) or reject (resulting in a returned item) when it decides there are insufficient funds in the account.  Nowhere does SFFCU disclose that it will treat each reprocessing of a check or other payment as a separate item, subject to additional fees, nor do SFFCU customers ever agree to such fees.

97.    Customers reasonably understand, based on the language of SFFCU's account documents during the time period relevant to this complaint, that SFFCU's reprocessing of checks or other payments are simply additional attempts to complete the original order or instruction for payment, and as such, will not trigger NSF Fees.  In other words, it is always the same item or transaction.

98.    Banks and credit unions like SFFCU that employ this abusive practice know how to plainly and clearly disclose it.  Indeed, other banks and credit unions that do engage in this abusive practice disclose it expressly to their accountholders—something SFFCU never did.

99.    For example, First Citizens Bank, a major institution in the Carolinas, engages in the same abusive practice as SFFCU, but at least expressly states:

> Because we may charge a service fee for an NSF item each time it is presented, **we may charge you more than one service fee for any given item**. All fees are charged during evening posting. When we charge a fee for NSF items, the charge reduces the available balance in your account and may put your account into (or further into) overdraft.[7]

(emphasis added).

100.    First Hawaiian Bank engages in the same abusive practices as SFFCU, but at least currently discloses it in its online banking agreement, in all capital letters, as follows:

YOU AGREE THAT MULTIPLE ATTEMPTS MAY BE MADE TO SUBMIT A

---

[7] https://www.firstcitizens.com/personal/checking/deposit-account-agreement

RETURNED ITEM FOR PAYMENT AND **THAT MULTIPLE FEES MAY BE CHARGED TO YOU AS A RESULT OF A RETURNED ITEM AND RESUBMISSION.**[8]

(emphasis added).

101.    Klein Bank similarly states in its online banking agreement:

> [W]e will charge you an NSF/Overdraft Fee each time: (1) a Bill Payment (electronic or check) is submitted to us for payment from your Bill Payment Account when, at the time of posting, your Bill Payment Account is overdrawn, would be overdrawn if we paid the item (whether or not we in fact pay it) or does not have sufficient available funds; or (2) we return, reverse, or decline to pay an item for any other reason authorized by the terms and conditions governing your Bill Payment Account. We will charge an NSF/Overdraft Fee as provided in this section regardless of the number of times an item is submitted or resubmitted to us for payment, and regardless of whether we pay the item or return, reverse, or decline to pay the bill payment.[9]

102.    SFFCU provided no such disclosure during the relevant time period, and in so doing, deceives its accountholders.

### G.  The Imposition of Multiple NSF Fees on a Single Transaction Breaches SFFCU's Duty of Good Faith and Fair Dealing

103.    Parties to a contract are required not only to adhere to the express conditions in the contract, but also to act in good faith when they are invested with a discretionary power over the other party.  In such circumstances, the party with discretion is required to exercise that power and discretion in good faith.  This creates an implied promise to act in accordance with the parties' reasonable expectations and means that SFFCU is prohibited from exercising its discretion to enrich itself and gouge its customers.

104.    Indeed, SFFCU has a duty to honor transaction requests in a way that is fair to Plaintiff Broussard-Johnson and its other customers and is prohibited from exercising its discretion to pile on ever greater penalties on the depositor.  Here—in the adhesion agreements SFFCU foisted on Plaintiff Broussard-Johnson and its other customers—SFFCU has provided itself discretionary

---

[8]https://www.fhb.com/en/assets/File/Home_Banking/FHB_Online/Terms_and_Conditions_of_FHB_Online_Services_RXP1.pdf

[9]http://cups.cs.cmu.edu/bankprivacy/notices/kleinfinancialinc1123915chaskamn16.pdf

1    powers affecting customers' credit union accounts.

2        105.     But instead of exercising that discretion in good faith and consistent with consumers'

3 reasonable expectations, SFFCU abuses that discretion to take money out of consumers' account

4 without their permission and contrary to their reasonable expectations that they will not be charged

5 multiple fees for the same transaction.

6        106.     As set forth in its Member Account Handbook, SFFCU states "We will charge the

7 Paid NSF fee (sometimes called the "clearing fee") or the **Returned NSF Fee for that item** stated

8 in the Fee Schedule, **per item** paid or **returned.**"  Ex. B. (emphasis added).  SFFCU exercises its

9 discretion in its own favor – and to the prejudice of Plaintiff Broussard-Johnson and its other

10 customers, when it reprocesses a transaction when it knows a customer's account lacks funds, and

11 then charges additional NSF Fees on a single item.  Further, SFFCU abuses the power it has over

12 consumers and their credit union accounts and acts contrary to their reasonable expectations under

13 the account documents.  This is a breach of SFFCU's implied covenant to engage in fair dealing and

14 act in good faith.

15        107.     By exercising its discretion in its own favor— and to the prejudice of Plaintiff

16 Broussard-Johnson and its other customers—by charging more than one NSF Fee on a single item,

17 SFFCU breaches the reasonable expectation of Plaintiff Broussard-Johnson and other customers and

18 in doing so violates the implied covenant to act in good faith.

19        108.     It was bad faith and totally outside Plaintiff Broussard-Johnson's reasonable

20 expectations for SFFCU to use its discretion to assess $75-100 in fees for single attempted

21 payments.

22        109.     When SFFCU charges multiple NSF Fees, it uses its discretion to define the meaning

23 of "item" in an unreasonable way that violates common sense and reasonable consumer

24 expectations.  SFFCU uses its contractual discretion to set the meaning of contractual terms and to

25 choose a meaning that directly causes more NSF Fees.  It abuses that discretion to repeatedly

26 reprocess transactions and to charge fees each time.

27

28

**H.    Plaintiff's Experience**

**a.  Authorize Positive, Purportedly Settle Negative Charges**

110.    Plaintiff Broussard-Johnson was assessed overdraft fees for APPSN transactions despite her account showing that she had sufficient funds to cover the transaction at the time of the transaction.

111.    For example, on August 3, 2020, Plaintiff Broussard-Johnson was assessed two Overdraft fees in the amount of $25 each for two transactions.  The first transaction was made on her debit card.  It cleared on August 2, 2020 and was initiated on or prior to August 1, 2020.  At the time this transaction was authorized, Plaintiff had sufficient funds to cover the transaction, and positive funds were deducted immediately for the transaction.  Yet Plaintiff was still assessed an Overdraft fee on this transaction.  The second transaction was a mobile payment for $50 that was made after the first transaction.

112.    Indeed, the only reason the first debit card transaction that settled on August 2 incurred an Overdraft fee was because of the $50 mobile payment that Plaintiff Broussard-Johnson made *after* the debit card transaction had already been initiated.

113.    Whether or not SFFCU was within its rights to charge an Overdraft fee on the $50 direct withdrawal, Plaintiff Broussard-Johnson disputes that SFFCU was authorized to charge an Overdraft fee on the prior-in-time debit card transaction.

**b.  Multiple Return Item/NSF Fee Charges**

114.    Plaintiff Broussard-Johnson was also repeatedly assessed multiple NSF Fees on individual transactions.

115.    For example, On September 3, 2020 Plaintiff Broussard-Johnson was assessed two $25 Return Item Fees for a $183 check that failed to clear.  Five days later, on September 8, 2020, Plaintiff Broussard-Johnson was assessed a third Return Item Fee for the same check.

116.    Thus, Plaintiff Broussard-Johnson had to pay three Return Item Fees for a single transaction despite SFFCU contract explicitly stating that only one NSF/Return Item Fee would be assessed "per item."  Ex. A.

117.    On September 15, 2020 Plaintiff Broussard-Johnson was assessed a $25 Return Item

1   Fees for a $165 check that failed to clear.  Two days later, on September 17, 2020, Plaintiff

2   Broussard-Johnson was assessed two more Return Item Fees for the same check.  Four days after

3   this, on September 21, 2020 Plaintiff Broussard-Johnson was assessed a fourth Return Item Fee for

4   the same check.

5        118.    Thus, Plaintiff Broussard-Johnson had to pay four overdraft fees for a single

6   transaction despite SFFCU contract explicitly stating that only one NSF/Return Item Fee would be

7   assessed "per item."  *Id*.

8        119.    Plaintiff was harmed by all of these practices.  A complete evaluation of SFFCU's

9   records is necessary to determine the full extent of Plaintiff's harm from these practices.

10                                   **CLASS ALLEGATIONS**

11        120.    Plaintiff brings this action on behalf of themselves and all others similarly situated

12   pursuant to Rule 23 of the Federal Rules of Civil Procedure.  This action satisfies the numerosity,

13   commonality, typicality, adequacy, predominance and superiority requirements of Rule 23.

14        121.     The proposed classes are defined as:

15   **Class 1: The Nationwide "Positive Balance" Class**

16        All United States residents who have or have had accounts with SFFCU who were

17        charged Overdraft fees on transactions that were authorized into a positive available

18        balance.

19   **Subclass 1: The California "Positive Balance" Class**

20        All California residents who have or have had accounts with SFFCU who were

21        charged Overdraft fees on transactions that were authorized into a positive available

22        balance.

23   **Class 2: The Nationwide Multiple NSF Fee Class**

24        All SFFCU account holders in the United States who were charged multiple NSF

25        Fees on the same item (the "Multiple NSF Fee Class") when their account

26        documents specified that only one NSF/Return Item Fee would be assessed "per

27        item."

28

1    **Subclass 2: The California Multiple NSF Fee Class**

2              All SFFCU account holders in the State of California who were charged multiple

3              NSF Fees on the same item (the "Multiple NSF Fee Class") when their account

4              documents specified that only one NSF/Return Item Fee would be assessed "per

5              item."

6    The classes and subclasses are collectively referred to as the "Classes."

7         122.    Plaintiff reserves the right to modify or amend the definition of the proposed Classes

8    before the Court determines whether certification is appropriate.

9         123.    Specifically excluded from the Classes are SFFCU, its parents, subsidiaries,

10    affiliates, officers and directors, any entity in which SFFCU has a controlling interest, all customers

11    who make a timely election to be excluded, governmental entities, and all judges assigned to hear

12    any aspect of this litigation, as well as their immediate family members.

13         124.    The members of the Classes are so numerous that joinder is impractical.  The Classes

14    consist of thousands of members, the identity of whom is within the knowledge of and can be

15    ascertained only by resort to SFFCU's records.

16         125.    The claims of the representative plaintiff are typical of the claims of the Classes in

17    that the representative plaintiff, like all members of the Classes, was charged Overdraft fees on

18    transactions that were authorized into a positive available balance and was charged multiple NSF

19    Fees on individual transactions.  The representative plaintiff, like all members of the Classes, has

20    been damaged by SFFCU's misconduct in that she has paid assessed unfair and unconscionable

21    Overdraft and NSF Fees.   Furthermore, the factual basis of SFFCU's misconduct is common to all

22    members of the Classes, and represents a common thread of unfair and unconscionable conduct

23    resulting in injury to all members of the Classes.  Plaintiff Broussard-Johnson has suffered the harm

24    alleged and has no interests antagonistic to the interests of any other members of the Classes.

25         126.    There are numerous questions of law and fact common to the Classes and those

26    common questions predominate over any questions affecting only individual members of the

27    Classes.

28

---

127.    The questions of law and fact common to the Classes include:

    a.   Whether SFFCU charged Overdraft fees on transactions that were authorized into a positive available balance;

    b.   Whether SFFCU charged multiple NSF Fees on a single transaction;

    c.   Whether SFFCU breached its own contract by charging Overdraft fees on transactions that were authorized into a positive available balance, by charging multiple NSF Fees on a single transaction, and/or by charging Overdraft fees on ATM and everyday debit card transactions to customers that did not opt-in to Overdraft Services;

    d.   Whether SFFCU breached the covenant of good faith and fair dealing by charging Overdraft fees on transactions that were authorized into a positive available balance and/or by charging multiple NSF Fees on a single transaction

    e.   The proper method or methods by which to measure damages; and

    f.   The declaratory, injunctive, and other equitable relief to which the Classes are entitled.

128.    Ms. Broussard-Johnson is committed to the vigorous prosecution of this action and has retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of consumers and against financial institutions.  Accordingly, Ms. Broussard-Johnson is an adequate representative and will fairly and adequately protect the interests of the Classes.

129.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the amount of each individual class member's claim is small relative to the complexity of the litigation, and due to the financial resources of SFFCU, no class member could afford to seek legal redress individually for the claims alleged herein.  Therefore, absent a class action, the Classes will continue to suffer losses and SFFCU's misconduct will proceed without remedy.

130.    Even if Class members themselves could afford such individual litigation, the court system could not.  Given the complex legal and factual issues involved, individualized litigation

1  would significantly increase the delay and expense to all parties and to the Court.  Individualized

2  litigation would also create the potential for inconsistent or contradictory rulings.  By contrast, a

3  class action presents far fewer management difficulties, allows claims to be heard which might

4  otherwise go unheard because of the relative expense of bringing individual lawsuits, and provides

5  the benefits of adjudication, economies of scale and comprehensive supervision by a single court.

6      131.    Plaintiff suffers a substantial risk of repeated injury in the future.  Plaintiff, like all

7  members of the Classes, is at risk of additional Overdraft fees on transactions that authorized into a

8  positive available balance and NSF Fees on repeated reprocessing of transactions.  Plaintiff and the

9  members of the Classes are entitled to injunctive and declaratory relief as a result of the conduct

10  complained of herein.  Money damages alone could not afford adequate and complete relief, and

11  injunctive relief is necessary to restrain SFFCU from continuing to commit its unfair and illegal

12  actions.

13      132.    SFFCU has acted or refused to act on grounds generally applicable to the Classes,

14  thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to

15  the Classes as a whole.

## CAUSES OF ACTION

### COUNT I
**Breach Of Contract and Breach of the Covenant Of Good Faith And Fair Dealing**
**(On Behalf Of The Classes and Subclasses)**

19      133.    Plaintiff incorporates by reference each of the allegations set forth in the preceding

20  paragraphs.

21      134.    Plaintiff and SFFCU have contracted for banking, account deposit, and checking

22  services, as embodied in SFFCU's account agreement and related documentation.  SFFCU's

23  account documents explicitly state that, when a customer lacks sufficient funds to cover a

24  transaction, the bank may either: (a) authorize the transaction and charge a single Overdraft Fee; or

25  (b) reject the transaction and charge a single NSF Fee.  SFFCU regularly violates its contractual

26  promises by:

27          a.   Charging Overdraft/NSF Fees to customers when the balance in their checking

1    accounts was sufficient to cover the transaction(s) at issue; and

2        b.   Charging multiple Overdraft/NSF Fees on a single transaction.

3    135.   Every contract carries with it an implied covenant of good faith and fair dealing.

4    Good faith and fair dealing, in connection with executing contracts and discharging performance

5    and other duties according to their terms, means preserving the spirit – not merely the letter – of the

6    bargain.  Put differently, the parties to a contract are mutually obligated to comply with the

7    substance of their contract in addition to its form.  The covenant requires faithfulness to an agreed

8    common purpose and consistency with the justified expectations of the other party to a contract.

9    Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad

10    faith in the performance of contracts.

11    136.   Subterfuge and evasion violate the obligation of good faith in performance even

12    when an actor believes their conduct to be justified.  Bad faith may be overt or may consist of

13    inaction, and fair dealing may require more than honesty.  Examples of bad faith are evasion of the

14    spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify

15    contract terms, and interference with or failure to cooperate in the other party's performance.

16    137.   SFFCU has breached the covenant of good faith and fair dealing in the contract

17    through its policies and practices as to Overdraft/NSF Fees as alleged herein.  Specifically, SFFCU

18    harms consumers by exercising its contractual discretion in bad faith, even though that discretion is

19    only vested in SFFCU, in ways no reasonable consumer would anticipate.

20    138.   SFFCU abuses that discretion to take money out of customers' accounts without

21    their permission and contrary to their reasonable expectations.

22    139.   Specifically, SFFCU regularly:

23        a.   Charges Overdraft fees to customers when the balance in their checking

24            accounts is sufficient to cover the transaction(s) at issue;

25        b.   Reprocesses previously declined transactions, even when SFFCU knows

26            a customer's account lacks sufficient funds; and

27        c.   Charges NSF/Overdraft/Return Item fees upon reprocessing of previously

28            declined transactions.

140.    SFFCU thus uses its contractual discretion points to extract Overdraft fees and NSF Fees on transactions that no reasonable consumer would believe could cause either.

141.    Plaintiff and members of the Classes have performed all, or substantially all, of the obligations imposed on them under the account agreement.

142.    Plaintiff and members of the Classes have sustained damages as a result of SFFCU's breaches of contract and breaches of the covenant of good faith and fair dealing.

143.    Plaintiff and members of the Classes are thus entitled to relief in the form of damages, restitution, injunctive and other appropriate equitable relief.

**COUNT II**
**Conversion**
**(On Behalf Of The Classes and Subclasses )**

144.    Plaintiff incorporates by reference each of the allegations set forth in the preceding paragraphs.

145.    SFFCU had and continues to have a duty to maintain and preserve its customers' checking accounts and to prevent their diminishment through its own wrongful acts.

146.    SFFCU has wrongfully collected Overdraft fees from Plaintiff and the members of the Classes, and has taken specific and readily identifiable funds from their accounts in payment of these fees in order to satisfy them.

147.    SFFCU has, without proper authorization, assumed and exercised the right of ownership over these funds, in hostility to the rights of Plaintiff and the members of the Classes, without legal justification.

148.    SFFCU continues to retain these funds unlawfully without the consent of Plaintiff or members of the Classes.

149.    SFFCU intends to permanently deprive Plaintiff and the members of the Classes of these funds.

150.    These funds are properly owned by Plaintiff and the members of the Classes, not SFFCU, which now claims that it is entitled to their ownership, contrary to the rights of Plaintiff and the members of the Classes.

---

1     151.    Plaintiff and the members of the Classes are entitled to the immediate possession of

2 these funds.

3     152.    SFFCU has wrongfully converted these specific and readily identifiable funds.

4     153.    SFFCU's wrongful conduct is continuing.

5     154.    As a direct and proximate result of this wrongful conversion, Plaintiff and the

6 members of the Classes have suffered and continue to suffer damages.

7     155.    By reason of the foregoing, Plaintiff and the members of the Classes are entitled to

8 recover from SFFCU all damages and costs permitted by law, including all property that SFFCU

9 has wrongfully converted.

10                  **PRAYER FOR RELIEF**

11     WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks

12 judgment against Defendant, as follows:

13         (a)    For an order certifying this action as a class action, appointing Plaintiff as

14              Class Representative, and appointing Plaintiff's counsel as Class Counsel;

15         (b)    For compensatory damages on all applicable claims and in an amount to be

16              proven at trial;

17         (c)    For restitution on all applicable claims and in an amount to be proven at trial;

18         (d)    For an order requiring Defendant to disgorge, restore, and return all monies

19              wrongfully obtained together with interest calculated at the maximum legal

20              rate;

21         (e)    For an order enjoining the wrongful conduct alleged herein;

22         (f)    For other appropriate injunctive and other equitable relief;

23         (g)    For costs;

24         (h)    For pre-judgment and post-judgment interest as provided by law;

25         (i)    For attorneys' fees under the account contracts, the common fund doctrine,

26              and all other applicable rules and law; and

27         (j)    For such other relief as the court deems just and proper.

28

1

## DEMAND FOR TRIAL BY JURY

2    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any

3   and all issues in this action so triable of right.

4

5   Dated:  January 13, 2021                    Respectfully submitted,

6
                                               **BURSOR & FISHER, P.A.**
7

8                                              By:   */s/ L. Timothy Fisher*
                                                     L. Timothy Fisher
9

10                                             L. Timothy Fisher (State Bar No. 191626)
                                               1990 North California Boulevard, Suite 940
11                                             Walnut Creek, CA  94596
                                               Telephone: (925) 300-4455
12                                             Facsimile: (925) 407-2700
                                               E-Mail:  ltfisher@bursor.com
13
                                               **BURSOR & FISHER, P.A.**
14                                             Joseph I. Marchese (*Pro hac vice* Forthcoming)
                                               888 Seventh Ave, Third Floor
15                                             New York, NY 10019
                                               Telephone: (646) 837-7150
16                                             Facsimile: (212) 989-9163
                                               E-Mail: jmarchese@bursor.com
17

18                                             *Attorneys for Plaintiff*

19

20

21

22

23

24

25

26

27

28

**EXHIBIT A**

Overdraft Privilege Notice and Opt In Form

**SAN FRANCISCO**
FEDERAL CREDIT UNION

After August 15, 2010 (as of July 1, 2010 for checking accounts opened after that date), we will not authorize and pay overdrafts on everyday debit card transactions under our standard overdraft practices unless you opt in (see below).

# What You Need to Know About Overdrafts and Overdraft Fees

An overdraft occurs when you do not have enough **available funds** in your account to cover a transaction but we pay it anyway.

We can cover your overdrafts in two ways:

(1) We have standard overdraft practices that come with your account.

(2) We also offer OD transfer protection plans, such as a link to a savings account or line of credit, which may be less expensive than our standard practices. To learn more, ask us about these plans.

This notice explains our standard overdraft practices.

**What are the standard overdraft practices that come with my account?**

We do authorize and pay overdrafts for:

• Checks and other transactions made using your checking account.

• Automatic bill payments.

• ACH transfers online, by phone or per preauthorized automatic bill payment.

We do not authorize and pay overdrafts for ATM transactions.

We do not authorize and pay overdrafts for the following types of transactions unless you ask us to (see below):
• **Everyday** debit card transactions on debit cards we issue.

We pay overdrafts at our discretion, which means we do not guarantee that we will always authorize and pay any type of transactions, even if you have opted in.

If we do not authorize and pay an overdraft, your transaction will be declined.

**What fees will I be charged if San Francisco FCU pays my overdraft?**

Under our standard overdraft practices:

• $30 per item, $100 daily maximum per transaction type
• $300 total daily maximum ($400 total daily maximum with Debit Card purchase transaction opt-in)

**What if I want San Francisco FCU to authorize and pay overdrafts on my everyday debit card transactions?**

If you want us to authorize and pay overdrafts on everyday debit card transactions, make your election in the form below. Call us at 415-775-5377, visit SanFranciscoFCU.com or visit a branch today.

✂

STANDARD OVERDRAFT PRACTICES
ELECTION FORM

○ **I DO NOT WANT** San Francisco FCU to authorize and pay overdrafts on my everyday debit card transactions.

○ **I WANT** San Francisco FCU to authorize and pay overdrafts on my everyday debit card transactions.
I understand that I have a right to revoke this election at any time.

_____
Printed Name

_____     _____
Member Number       Account Type     (One account per form—please photocopy or use alternate method for additional accounts.)

**SAN FRANCISCO**
FEDERAL CREDIT UNION

_____
Signature                            Date

FOR INTERNAL USE ONLY

Date Received        Date Processed        Initials

(Updated: 12-8-20)

**EXHIBIT B**

# YOUR
# SAN FRANCISCO
# FEDERAL
# CREDIT UNION
# MEMBER
# HANDBOOK



# INTRODUCTION

Thank you for joining San Francisco Federal Credit Union ("Credit Union"). By signing a Membership and Account Application, you agree to the terms in this Handbook that apply to the Credit Union services for which you apply and are approved.

Our goal is to provide you the highest yields on your savings and the lowest interest rates on your loans that are consistent with safe and sound management, outstanding membership service and financial stability.

This Handbook is a master agreement and disclosure of all San Francisco Federal Credit Union share accounts. It supplements the terms of the Truth-in-Savings Account Disclosure (including a schedule of Fees and Charges), Membership and Account Application, and other documents you will receive in your  Credit Union Membership Kit. When you open your regular Share Savings Account and any sub-account, you will also receive a receipt showing specific terms. We may disclose additional terms of share accounts to you whenever you open a new share account, in periodic statements we will send you, and in our Credit Union newsletter. Not all of the terms spelled out in this Handbook apply to every share account and not all receipts will show all share account terms. Please refer to the sections of this Handbook that apply to the specific share account types you have.

This Handbook also outlines your rights and obligations as a member-owner of the Credit Union.

Your Credit Union also offers home mortgage loans, home equity loans, home equity lines of credit, credit cards, vehicle loans and other consumer loans. These loans will be subject to separate written agreements. Your general obligations as a Credit Union Member as explained in this Handbook apply to all agreements you make with the Credit Union, including loan agreements.

Keep this Handbook with your permanent records. The Credit Union may change the terms of this Handbook and other contracts you make with us by sending you written notice required by law. You should also keep any such notices with your permanent records.

### *BY MAINTAINING MEMBERSHIP IN THE CREDIT UNION, YOU SUBMIT TO BINDING NONJUDICIAL ARBITRATION OF DISPUTES. REFER TO PAGE 42 IN THIS HANDBOOK.*

## GENERAL AGREEMENTS OF MEMBERS

### JOINING THE CREDIT UNION

We require that you complete an original Membership and Account Application to join the Credit Union. Blank Membership and Account Applications are available at Credit Union offices, by mail, or on our website (see HOW TO CONTACT US at the end of this Handbook). If you are eligible for membership through employment in a department of the City and County of San Francisco, you may be able to obtain a membership application from your employer. You can bring your completed Membership and Account Application to any Credit Union office. Your Membership and Account Application may also be submitted by mail, fax or by electronic submission and we will open your requested Accounts andbegin accepting deposits immediately. However, to protect both you and the Credit Union, unless your Membership is established in person at a Credit Union office, we will not allow withdrawals from your Accounts or make credit available to you until we receive the following items:

(1) the original Membership and Account Application with your original signature, (2) a photocopy of a valid photo ID showing your signature, (3) a copy of a document (such as a current utility bill) showing your current residence address (P.O. boxes and private mailbox service addresses are not acceptable); and, (4) if you are eligible for membership through employment, a copy of your most recent pay stub. Although we will send mail to P.O. boxes or private mailbox addresses at your request, we must have the street address of your residence to open your membership. Further, we will not provide Credit Union services to any person who does not provide us with a valid U.S. tax-payer identification number or an IRS exemption determination.

## TERMINOLOGY

In this Handbook, "you" and "your" refer to the Credit Union member and any joint owner of a share account. "Member" refers to the person who signs a Membership and Account Application in that capacity and makes the required deposit to join the Credit Union. "Joint Owner" refers to a person designated by a Member as a co-owner of the Member's Credit Union accounts. "Agent" means any person validly authorized by a Member or Joint Owner to transact on Credit Union accounts or loans, such as an attorney-in-fact. "Authorized Persons" include Members, Joint Owners of Accounts, co-borrowers and guarantors on loans, and Agents. "Obligor" means any person who undertakes the obligation to meet an obligation to the Credit Union, including but not limited to members, joint owners, and non-borrowing co-signers on loans. "We," "us," and "our" refer to the Credit Union. We call our accounts by the following names: "Share Draft Accounts" are "Checking Accounts," "Money Market Share Accounts" are "Money Market Savings Accounts," "Regular Share" and "Share Accounts" are "Savings Accounts," and "Term Share Accounts" are "Term Accounts." "Board" refers to the Credit Union's Board of Directors. "New account" means an account open less than 30 days. The singular implies the plural when an account has more than one owner.

## MEMBERSHIP REQUIREMENTS AND ELIGIBILITY FOR SERVICES

Membership is open to anyone who lives, works, worships or attends school in the City and County of San Francisco or San Mateo. Businesses and other legal entities located in the City and County of San Francisco or San Mateo are also eligible. Family members of current members, including spouses, partners, parents, children, grandparents, grandchildren, siblings, and persons residing in the same household maintained as a single economic unit, can join, regardless of where they live or work. Immediate family members include those related by marriage, such as step-siblings, step-parents and step-children, and by adoptive relationships.

If you are within our field of membership and otherwise meet our criteria, your completion of a Membership and Account Application and deposit to a Regular Share Savings Account of the required minimum balance shown on the Truth in Savings Disclosure, establishes you as a member of the Credit Union and entitles you to apply for all of our savings and lending services. All services are subject to approval.

Minors may be required to have an adult joint owner/signer to be eligible for services. For voting rights and eligibility to hold office, minors should consult our bylaws.

Once you become a Member, you are always a Member, even if you move, change jobs, or retire.

As a Member-owned cooperative, San Francisco Federal Credit Union is your Credit Union. Members are expected to uphold high standards of honesty, personal responsibility and courtesy in dealing with the Credit Union and other Members. We reserve the right to deny all services except the right to maintain a share account and to vote, and if appropriate restrict or prohibit your access to Credit Union premises, if any of the following occur: (1) You fail to meet your obligations to the Credit Union; (2) You fail to comply with applicable law and the Credit Union's bylaws and rules as amended from time to time; (3) You are convicted of a crime in connection with business you conduct with the Credit Union; (4) You cause the Credit Union a loss in any way (including but not limited to loan charge-off, account overdrafts, or bankruptcy, or (5) You fail to conduct your business with the Credit Union in a civil and business like way. Violence or threats of violence against, or harrassment of, Credit Union staff, volunteers or other Members will not be tolerated. Persons carrying weapons or under the visible influence of alcohol or controlled substances are not permitted on Credit Union premises. If you fail to meet your obligations to us because of a bona fide emergency such as a catastrophic illness, we may, at our sole option, allow you to maintain your membership privileges.

## MEETING YOUR OBLIGATIONS

To make it possible for us to achieve our goals of offering high returns on your savings and affordable credit, all Members must meet their obligations to the Credit Union in a timely manner.

You agree to comply with the terms and conditions governing the Credit Union services you request.

You agree to be honest with the Credit Union about your financial circumstances. You agree not to omit any material information from loan applications. You agree not to request credit or use credit cards or lines of credit if you have reason to believe you will be unable to make the required payments.

You will not allow Credit Union Savings or Checking Accounts you open to fall below a zero balance. If you do inadvertently overdraw any Savings or Checking account, and you do not have a prearranged and available source of overdraft protection available, you agree to immediately restore any overdraft upon our written demand. If you do not promptly restore the overdraft, you agree that our Right of Recovery (see below) applies. If we cannot recover the amount under our Right of Recovery, you agree that our right to recover Collection Costs (see below) applies. Please note, overdraft protection, loan advances or transfers, if you have them available, will be made only to checking accounts.

You will take responsibility for items deposited to your accounts that are returned unpaid. (See the "Deposits and Withdrawals" section of this Handbook for more information.)

You agree to repay money you borrow from the Credit Union according to the terms of the applicable loan agreement.

## OUR DISCLOSURE OF INFORMATION ABOUT CREDIT UNION SHARE ACCOUNTS AND LOANS

We will give information about share accounts and loans to Authorized Persons. Information requests may be subject to research and copying fees. We will also provide information about your accounts, loans or other Credit Union activity, if we receive a lawful information request such as a subpoena that meets legal requirements. We will disclose account information to a designated pay-on-death (POD) beneficiary only if all account owners are deceased and the POD beneficiary is identified to our reasonable

3

satisfaction. For further information about our maintenance of the privacy and security of information about our members, former members and other consumers, please refer to our Privacy Policy.

The Credit Union may issue "bundled" statements, meaning that most or all accounts held under a single member number will appear on the same periodic statement. Statements are mailed to the member associated with the member number. Individuals who are joint owners, joint obligors or authorized persons on accounts or loans associated with the member number consent to disclosure of the information contained on periodic statements to the member and to all individuals who are parties to accounts or loans associated with the member number.

We acknowledge the obligation to honor court orders (such as court orders appointing conservators) and lawful powers of attorney dealing with your specific accounts or loans and will disclose information to persons so appointed. However, except as indicated here, the Credit Union does not recognize persons who are authorized signers but not joint owners. (Business accounts for non-natural person entities such as corporations that permit authorized signers, if available, are covered by separate agreements.) All other signers are automatically joint owners.

## OUR OBLIGATION TO FOLLOW YOUR INSTRUCTIONS

We are required to follow written instructions transmitted to us on your accounts or loans by Authorized Persons or by a court of competent jurisdiction. We consider instructions received is writing or via electronic means such as ATM keypads, ExpressLine (Audio Response), or Online Banking to be "written" instructions. Our following the written instructions of any Authorized Person excuses the Credit Union of any further legal obligation regarding the proceeds of the transaction. You agree to defend and indemnify and save the Credit Union harmless from any claims, suits or liability that directly or indirectly result from our handling of your accounts or loans consistent with an Authorized Person's written instructions.

The Credit Union has the right to refuse to honor your instructions if they are uncertain or if a signature appears not to be authentic. If that happens, we will notify you of the fact in writing.

## PROHIBITION ON ILLEGAL ACTIVITY

You agree not to use any Credit Union products, devices or services, such as but not limited to Debit Cards and Credit Cards, to engage in illegal activity such as illegal online gambling. We can refuse to process transactions if we reasonably believe them to be illegal, but we have no obligation to you to determine the legality of transactions initiated by Authorized Persons. You cannot use the actual or alleged illegality of authorized transactions as a defense to your obligation to pay amounts you become indebted to us as a result of those transactions.

## OUR RIGHT TO FREEZE ACCOUNTS AND LOANS OR BLOCK TRANSACTIONS

We can freeze accounts and loans or refuse to complete transactions if any Authorized Person is in default on any material obligation to us, or if we reasonably believe that allowing the requested transaction will cause us a loss. In case of conflicting instructions, we reserve the right but do not undertake the duty to freeze funds in any account or refuse to make loan advances until we receive consistent written instructions from all Authorized Persons or a valid order from a court of competent jurisdiction. We may block accounts or decline transactions consistent with requirements

4

imposed by laws, regulations or government agency directives. For example we can block illegal internet gambling transactions, block transactions prohibited under rules promulgated by the Office of Foreign Assets Control (OFAC), or refuse to allow transactions prohibited by court orders we have on file.

## RECOVERY OF YOUR UNPAID OBLIGATIONS FROM YOUR CREDIT UNION SHARES ("RIGHT OF RECOVERY")

By maintaining membership in the Credit Union, you agree that if you become indebted to us for any reason, whether by failing to pay a loan, failing to restore a negative share account balance or otherwise, and you fail to pay what you owe us according to the terms of your agreements with us or upon our written demand, we can take any Credit Union shares in which you have an interest, without notice to you, to collect all or part of what you owe us (unless expressly prohibited by law or the share agreement). This consent by you is in addition to our right to impose a lien on shares to the extent of your obligations under the Federal Credit Union Act and any equitable right of offset under state or federal law. Our exercising our rights under this section of the Handbook will not be an election of remedies and will not impair our rights to pursue any other remedies we may have against you. You agree that your consent extends, to the maximum extent allowed by law to all funds voluntarily deposited to Credit Union share accounts, including funds normally exempt from creditors' remedies such as social security direct deposits. You acknowledge that the Credit Union never requires deposit of exempt funds to Credit Union share accounts. The consent you give under this section of the Handbook is not a pledge by you of any shares and will not affect your right to withdraw funds prior to your default and our exercise of our rights under your consent. Our right to recover what you owe will take priority over any third party claim to your share accounts and over the rights of others claiming an interest in your share accounts, such as surviving joint owners or pay-on-death beneficiaries to whom your account transfers in the event of your death.

## COLLECTION COSTS

If you are in default in any obligation, you agree to pay reasonable costs we incur to collect what you owe us before we take legal action. If we take legal action of any kind (including but not limited to collection lawsuits, proceedings to protect our interests if you become a bankruptcy debtor, appeals, foreclosures, or actions to enforce judgments), you agree to pay our reasonable attorney's fees and costs of the action.

## FEES AND DAMAGES

All Credit Union Share Accounts and Loans may be subject to fees. Our fee  structure is designed to encourage use of Credit Union services and to create incentives for Members to meet their obligations and handle their accounts in a responsible way. All fees are disclosed on our separate Schedule of Fees and Charges. The Schedule of Fees and Charges, as amended from time to time, is incorporated by reference into this Handbook and made part of it.

Fees for special handling of Accounts and Loans result in some instances from your failure to carry out your agreements with us. To the extent that our charges for handling such matters may exceed our costs, they are to be considered  damages.  You agree that our collection of a fee does not waive any right we may have under the law to recover any loss we sustain due to your failure to meet the terms of this Handbook or other agreements you have with us. We also have the right to extra damages whenever the law

provides for them, such as the exemplary damages provided as a penalty for writing bad checks.

## GOVERNING AGREEMENTS AND LAWS

This Handbook, Credit Union Bylaws and policies, applicable California and federal laws as amended from time to time, and any separate agreements and disclosures provided to you will govern your transactions with San Francisco Federal Credit Union. The Credit Union may amend agreement terms from time to time consistent with applicable law and regulation by notifying you. If any provision of this Handbook in its present form or as amended from time to time is found to be void or unenforceable, the rest of the Handbook and amendments to it will remain in effect.

The Credit Union will comply with lawfully issued subpoenas, levies, writs of attachment, and similar orders pertaining to your shares and loans. We will not incur liability to you for implementing any garnishment, attachment or levy or for complying with lawful information requests. You must take up any objections you have on matters of this type directly with the individual or entity that has requested information about or asserted a claim to your shares.You agree to defend and indemnify and hold us harmless from any third party claims that arise because of our handling of your shares while a third party claim is pending, such as if we honor drafts while a levy is in process.

## BACKUP WITHHOLDING

The Credit Union has the right to withhold amounts required by federal tax laws from withdrawals if you or the Internal Revenue Service advises us that you are subject to backup withholding or if you fail to give us your correct Taxpayer's ID/Social Security Number.

## WAIVER; MODIFICATION

The Credit Union can fail to exercise one or more rights we may have under this or any other agreement we have with you on one or more occasions without such failure being deemed a waiver of any right and without altering the terms of any agreement with you.  Consistent with any limits imposed by law, the Credit Union can modify any of its agreements with you by giving notice required by law and allowing you an opportunity to avoid the changes by satisfying any  outstanding obligation you have to the Credit Union and discontinuing the related service. Discontinuation of any service by you or us will not relieve you of your obligations to us. "Modify" may include changing existing terms, adding new terms or deleting terms. Modifications can occur only through official Credit Union change in terms notices, orders of courts of competent jurisdiction, or written agreements signed by authorized Credit Union agents.

## AUTHORIZATION TO REVIEW ACCOUNT AND CREDIT HISTORY

Your Membership and Account Application allows us to check your credit from time to time to determine your eligibility for Credit Union products and services, and products or services you did not request may be offered to you as a result. You can revoke this authorization at any time by notifying the Credit Union in writing. In any case, if you apply for share accounts or loans, or maintain any open-end credit (such as a Line of Credit or Credit Card) or share accounts, we can check your credit or account history with third parties as part of our normal account review process. Based on our review, we can increase or decrease credit limits, adjust rates and fees, or limit or terminate share account services.

## TAX REPORTING

We comply with the Internal Revenue Code, IRS regulations and state law in reporting your earnings on savings, your interest payments on certain types of loans, and filing other information returns such as for miscellaneous income. You are responsible for providing the Credit Union with the correct taxpayer identification number on all accounts you open with us. We have no duty of further inquiry as to the correctness of the number you provide, but we will not open or maintain accounts without taxpayer identification numbers.

## CHANGE OF ADDRESS

You must promptly notify us of any change of your residence and mailing addresses. If we make the service available and you have elected to receive materials such as statements and disclosures from us electronically, you must promptly notify us of any change in your email address. If you do not promptly notify us of any change in your mailing address, we may charge locator service fees to your account. (See the current Fee Schedule.) If email we send you is returned undeliverable, we will resume sending communications to you by postal mail until we receive an updated email address for you. If you do not receive statements or other materials that you expect to receive from us on a regular basis, contact us immediately at a location indicated in the "HOW TO CONTACT US" section at the end of this Handbook to request copies of the materials you have missed. We will not be responsible for unauthorized transactions or other errors if you do not notify us within the time frames specified elsewhere in this Handbook.

## NOTICES

All notices sent by the Credit Union will be effective when mailed to you at your last address as shown on our records. If the service is available and you elect to receive notices (including periodic account and loan statements) electronically, either the notice itself or a message that the notice is available for viewing at the Credit Union's secure website will be sent to you at the last email address we have for you. In the case of joint accounts or loans, notice to or from one account holder or borrower will be effective for all account holders or borrowers unless otherwise specified in this Handbook or required by law.

## CONSENT TO USE OF WIRELESS PHONE NUMBERS

For purposes of debt collection, you expressly consent to receipt of phone calls from the Credit Union (or its representatives) using all phone numbers provided by you, including but not limited to cell or wireless phone numbers, and whether or not the Credit Union is aware the number is a cell or wireless number. Debt collection includes, but is not limited to, the use and/or employment of automated / auto-dialer and pre-recorded message calls to cell or wireless phone numbers provided by you. You acknowledge and expressly consent to the Credit Union's use for debt collection purposes of auto dialers and pre-recorded messages to cell or wireless phone numbers which have been provided by you. You expressly consent to the receipt of debt collection calls on your cell or wireless phone and phone numbers. You further acknowledge that said debt collection calls, including the use of auto dialers and pre-recorded message calls, may result in a fee charged to you by your wireless service provider.

## YOUR CONSENT TO THE TERMS OF THIS HANDBOOK

Your payment of the Credit Union membership fee (if any), deposit of the required minimum balance to a Regular Share Account and completion of a

Membership and Account Application constitute your agreement to the terms of this Handbook. You confirm that any Credit Union services established under your membership will be for personal, family or household purposes.

## YOUR CREDIT UNION SHARE ACCOUNTS

### GENERAL INFORMATION

**Par Value** of a Credit Union share is stated on the Truth in Savings Disclosure.

### Earnings and Payment of Dividends

Most Credit Union Accounts earn dividends. If an account earns dividends, they accrue from the day after the business day we receive your deposit or as stated in the FUNDS AVAILABILITY section. The Board sets our competitive dividend rates, taking into consideration the cost of funds and market conditions. Dividends are only paid out of current income and available earnings after required transfers to reserves at the end of the dividend period. Dividends cannot be guaranteed. Except for Term Accounts, dividend rates and corresponding annual percentage yields are not set in advance. Unless otherwise indicated, dividend rates and yields are variable and can change at any time. The Board may change dividend cycles. See our separate Truth-In-Savings Disclosure for current dividend rates and Annual Percentage Yields (APYs) on all share accounts. The Truth-In-Savings Disclosure, as amended from time to time, is incorporated by reference into this Handbook and made part of it.

### Account Ownership and Transfer of Proceeds at Death

You own and are considered the member on all share accounts established under your Member number. When permissible, you may designate one or more joint owners of your accounts on your Membership and Account Application. (Joint owners on IRA, IRA Term, Minor and Fiduciary Accounts are prohibited.) Joint owners must sign the Membership and Account Application along with the Member.

Joint owners own all proceeds of each share account on which you have designated them, including dividends, with right of survivorship. Joint owners may deposit or withdraw any amount in any share account on which you have designated them. Withdrawal by any one owner of funds from a joint account terminates the rights of all other share account owners to the withdrawn funds. If a joint owner withdraws funds that qualify a Member for membership, the Member can reinstate the membership to active status by depositing the required minimum membership balance.

Any disputes about the ownership of funds in joint accounts or obligations for loan payment must be resolved by the account owners or borrowers without involvement from the Credit Union.

Joint owners acting individually may pledge share accounts as security for loans. In addition, if a joint owner becomes indebted to the Credit Union in any manner, any shares in which the joint owner has an interest becomes subject to the Credit Union's Right of Recovery, even if the primary member is not a party to the transaction that resulted in the joint owner's debt. Joint owners must belong to the Credit Union in their own right to open individual share accounts, to borrow money from the Credit Union, to vote in Credit Union elections, and to hold Credit Union office.

Should any owner of a joint account die, any surviving owner(s) will automatically own any money in the account. If a sole surviving owner is not a member of the Credit Union, that person must join the Credit Union or close

8

the account. When the last owner dies, the account proceeds will automatically pass to any named Pay-on-Death (POD) beneficiary(ies), or, if no beneficiaries are named, to the estate of the last owner to die.

Members may also own share accounts individually rather than jointly. On individual accounts, the account proceeds will transfer at the Member's death to any named POD beneficiary(ies) or, if no beneficiaries are named, to the Member's estate.

On share accounts with designated POD beneficiaries, funds pass automatically to the named beneficiaries and are not subject to any probate proceeding. If you name more than one POD beneficiary, your beneficiaries will receive proceeds in equal shares unless you indicate otherwise on your Membership and Account Application.

The Credit Union's right to recover the unpaid obligations of a deceased share account owner will prevail over the rights of surviving joint owners or POD beneficiaries to the funds in the account.

If a Member wishes to designate different joint owners for different accounts, or to have both joint and individual accounts, or to have different POD beneficiaries for different accounts, you must complete a separate Membership and Account Application for each joint ownership or POD beneficiary combination. Only the accounts you designate on the Membership and Account Application will have that combination of joint owners and/or POD beneficiary(ies).

Under community property law, either spouse has a right to set up an account in his or her own name without the consent of the other spouse, whether or not the account owner has designated a POD beneficiary. However, the surviving spouse of the account owner may have a right to his or her community property interest in the account on the death of the joint owner. This interest, if asserted, would reduce the amount that transfers to the POD beneficiary. The Credit Union reserves the right to hold funds until receipt of consistent written instructions or a court order if we are notified of a dispute regarding the entitlement of a POD beneficiary to funds in a deceased member's account.

POD beneficiaries are not allowed on Minor or Fiduciary Accounts.

You may wish to consult with your tax advisor or legal advisor before you designate POD beneficiaries on IRA accounts because your decision may have significant tax consequences.

### Changing Account Ownership or Beneficiaries

Any change in account ownership or access shall be in writing and on an amended Membership and Account Application. Consistent with the California Probate Code, if an owner of a joint account wishes to remove the other owner(s), either (1) that person must withdraw all funds, close the account, and re-open it in the new owner's name, or (2) all current owners must consent in writing to the change. If the owner wishing to remove other owners is not a member, he or she must qualify for and establish membership to re-open the account.

If there is a conflict between information you have provided on different Membership and Account Application at different times for the same account type, the information on the most recent Membership and Account Application will govern. We will assume that any omission of information on a more recent Membership and Account Application is intentional. For example, if an older Membership and Account Application named a POD beneficiary and a more recent Membership and Account Application leaves the POD beneficiary space blank, we will assume that you want account proceeds to pass to your estate at your death and not to pass to your previously named POD beneficiary.

9

## Continuing Authorization to Open Accounts

By completing a Membership and Account Application, you give the Credit Union a continuing authorization to open any account for you on your oral or written request and deposit of funds. Any share account opened by oral authorization under a member number for which we do not yet have a Membership and Account Application on file is an individual account until a valid written Membership and Account Application, executed by the Member and any Joint Owners, is returned to the Credit Union.

## Deposits and Withdrawals

Funds can be deposited to your accounts by (1) direct deposit of your net pay or retirement benefits, (2) automatic payroll deduction, (3) automated clearinghouse transfer (ACH), (4) in person at Credit Union branches or Credit Union Service Centers, (5) by mail, (6) by wire transfer, (7) through San Francisco Federal Credit Union ATMs and deposit-taking ATMs on other networks that we specify from time to time or (8), by Mobile Deposit using a mobile device or a computer with a scanner and internet access. Mobile Deposit terms and conditions will be disclosed when you enroll in the service using your mobile device or computer, and can be found on our website.

Withdrawals can be made (1) by the ExpressLine Voice Response System, (2) by Online Banking, (3) in person, (4) at select network ATMs, (5) by writing checks if you have a Credit Union Checking Account, (6) by pre-authorized electronic fund transfer (ACH), or (7) by telephone. Personal telephone withdrawals, ExpressLine withdrawals and Online Banking withdrawals will only be made by transfer to another Credit Union account of yours or by Credit Union check payable to the primary member and mailed to the primary member's address as shown on our records.

Certain deposits are subject to delayed availability, as spelled out in the "FUNDS AVAILABILITY POLICY" section of this Handbook.

On your Credit Union Checking Account, including your Health Savings Account, you may write as many checks and make as many transfers or withdrawals out of the Account as you wish, provided you have sufficient available funds. The number of deposits you may make is unlimited on all account types except for Term Accounts. However, consistent with Federal Reserve Regulation D, the number of transfers out of your Regular Share Savings Accounts, Money Market Savings Accounts, and Youth Accounts by certain methods is limited. You may make as many withdrawals or transfers out of these accounts as you wish using these means: (1) in person, (2) by mail, (3) by messenger, (4) at the ATM, or (5) by a telephone request to mail a check payable to you to your address in our records. All other withdrawals or transfers out of these accounts (which we refer to as "non-personal withdrawals") are limited to six per month. Examples of transfers or withdrawals out of these accounts to which the limits apply include: (1) pre-authorized automatic payments, such as for health club dues or utility bills; (2) automatic transfers (including overdraft protection transfers); and (3) account transfers or payments to third parties requested by telephone, by telephone access through ExpressLine Voice Response System, and by online requests through Online Banking including Bill Pay and Mobile Banking.

We may refuse to accept for deposit checks or other items that are stale dated (more than six months old), appear to have been altered or are not made payable to you. However, we have no obligation to refuse items presented for deposit to your accounts. We operate in an automated processing environment and do not physically examine all items presented for deposit.

You agree to defend, indemnify and hold the Credit Union harmless from any claims, losses, liability, damages or expenses we incur as a result of accepting items for deposit to your accounts, unless we fail to exercise ordinary care.

We can accept an item payable to you alone for deposit to any account of which you are the owner in our records, whether or not you have endorsed the item, and whether the account to which it is deposited is shown on our records as a joint account or a single owner account. If an item is payable to you or another person, we can accept the item for deposit to any account of which you are an owner in our records, whether or not you or the other person(s) have endorsed the item, and whether the account to which the item is deposited is shown in our records as a joint account or a single owner account. If an item is payable to you and another person: (a) we can accept the item for deposit to any account on which you and all other payees are joint owners in our records, whether or not you and/or the other payee(s) have endorsed the item; (b) if all payees have endorsed the item for deposit to an account that you have with us, we will accept the item for deposit to that account, regardless of the ownership of that account; and (c) if the item is deposited to an account on which all payees are not shown as joint owners in our records, we can, at our option, either refuse to accept the item for deposit, or accept the item for deposit to an account that our record show is owned by an endorsing payee. If we accept the item for deposit to an account owned by an endorsing payee, the endorsing payee agrees to defend, indemnify and hold the Credit Union harmless from any and all claims by non-endorsing payees. If an item is not payable to you but has been endorsed over to you by a third party payee, we reserve the right to refuse to accept the item for deposit to your account or to require that the third party payee's financial institution guarantee the third party's endorsement. If you deposit an item that is not payable to you or endorsed to you by the payee, you agree to defend, indemnify and hold us harmless from any claims or losses we incur, and you may be subject to civil suit or criminal prosecution. We have the right, but not the obligation, to refuse to accept for deposit items payable to you but not endorsed by you.

If we receive an erroneous deposit, such as a duplicate direct deposit of your net pay or a direct deposit of social security benefits after the payee's death, we can return the erroneous deposit to the payor and deduct the amount of the erroneous deposit from the account of deposit.

If an item you deposit is returned unpaid, we will deduct any amount for which you have received provisional credit from your accounts. All credits are provisional until we receive final payment from the institution on which the deposited item is drawn.

You acknowledge that our making funds from a non-cash deposit available to you for withdrawal is not a guarantee or representation by us that the item you deposited will be paid. If you are concerned about the validity of an item you want to deposit, you should contact the financial institution on which the item is drawn. No Credit Union employee has the expertise or is authorized to give you an oral or written guarantee that an item you deposit will be paid. Should any Credit Union employee state orally or in writing that they believe an item you deposit will be paid, that should be interpreted only as that employee's best guess and not as a guarantee. If the paying financial institution lawfully returns an item you deposited, we will deduct the amount of the item from your account, even if you have already withdrawn the funds and even if the deduction results in a negative balance.

We can deduct amounts of erroneous payments or uncollected deposits

without advance notice to you, though we will notify you as soon as is reasonably practicable. You must, upon our demand, restore any negative balance that results from our deducting erroneous or uncollected deposits from your accounts. If you do not do so, our Right of Recovery applies. If we cannot restore the negative balance by exercising our Right of Recovery, our right to recover Collection Costs applies.

Items drawn on an institution located outside of the United States are handled on a collection basis only as long as the amount is equivalent to $200.00 (US) or over. Funds will be credited to your account when we receive final payment. There is a fee for collection items. Please see the Fee Schedule. We reserve the right to refuse to accept deposits of items that are not drawn on U.S financial institutions.

## Non-Transferability of Share Accounts

Except for Checking Accounts, all accounts are non-transferable, other than on the books of the Credit Union. This means that shares can only be transferred to other members. To transfer your shares to another member, you must use a written form acceptable to us. Credit Union by-laws permit us to require a notice of at least 7 and up to 60 days before you withdraw shares.

Funds pledged as security for loans cannot be withdrawn without the Credit Union's prior written consent. We may refuse withdrawals if you have delinquent obligations with us.

## Federal Insurance

Accounts at San Francisco Federal Credit Union are federally insured by the National Credit Union Administration, a U.S. government agency. IRAs have additional federal insurance coverage. Federal insurance levels vary depending on federal insurance limits approved by financial institution regulators, account type, account ownership combinations and POD beneficiary designations. For current information about federal account insurance, please visit the web site of the National Credit Union Administration, ncua.gov.

## Dividend Calculation, Compounding and Crediting

Refer to the Truth in Savings Disclosure.

## Fees

Credit Union Accounts may be subject to fees, which, if assessed, may reduce earnings. Please see the separate Schedule of Fees and Charges

## Permanent Records and Statement Review

We will mail you periodic statements recording all deposits, withdrawals, checks drawn on your account, dividends (if any), and fees. All accounts will receive a statement monthly. If there is more than one owner of the account, the statement will be sent to the member.

If you enroll in Paperless Statements, instead of Paper Statements, you will receive an e-mail notifying you when statements are available for you to retrieve on our secure web site. If you have enrolled in Paperless Statements and our e-mails are rejected due to an invalid address, we will resume sending paper statements and will assess a monthly paper statement fee unless you notify us that you do not wish to receive an e-mail notifying your statements are available for pickup. See the Schedule of Fees for the amount.

We will mail statements to you at your address in our records. Notify us of any address change. If we receive a notice that an address we have for you

is no longer valid, we will attempt to locate you once without charge. If our effort to locate you is unsuccessful, we may assess an invalid address fee against your account. See the Schedule of Fees for the amount.

You will not receive your canceled checks, although all checks are imaged and retained in that form for seven years. The IRS accepts copies for tax purposes. We will provide two check copies per statement period free of charge. Additional check copies are available for a small fee. See the Schedule of Fees and Charges.

The Credit Union is not responsible for items lost or misdelivered by the post office or otherwise not collected by the member.

If you are expecting a statement and have not received it, please contact the Credit Union to request a duplicate.

### In Case of Errors or Inquiries about your Statement:

If you suspect that there was an unauthorized signature or alteration of an item that affected one of your accounts (for example, if you think someone forged your signature on your check), you must notify us, in writing, within **thirty (30) days** after we made the statement on which it appears available by mail or electronically, or we will not be responsible for the item. Tell us all the information requested under the section entitled "WHAT TO TELL US IN CASE OF ANY ERROR OR INQUIRY."

Electronic Transfer Errors or Unauthorized Use: Please see the separate Electronic Funds Transfer Agreement and Disclosure in this Handbook for information about your rights and responsibilities.

Because we operate in an automated check processing environment, it is not feasible for us to physically examine checks that clear. For this reason we are, as allowed by law, altering the provisions of the California Commercial Code related to the time within you must report unauthorized signatures, alterations or other errors on your account.

If we correct any error that we made or accept any responsibility for a transaction, we have the right to collect the amount credited to your account from anyone else who is responsible. Our crediting your account will result in an automatic assignment to us of your rights to collect the amount from anyone else. You agree to cooperate with our efforts to collect the amount we credited to your account.

If we make an error in handling your account, our liability will be limited to the actual damages. The maximum actual damages are the amount of the transaction. We will not be liable for consequential damages such as alleged harm to your credit standing, unrealized profits, emotional distress or exemplary damages due to a claimed reckless disregard of the consequence of our actions.

### Closing Accounts; Termination of Services

We have the right to close your accounts for any business reason on 10 days' written notice to you at your last known address. Any closing of your accounts will not affect our handling of regular transactions prior to the notice, provided that sufficient funds are available to handle them. Other grounds for closing your account(s) or terminating services with or without advance notice include your writing NSF checks without overdraft protection, your failure to pay your loans, your misuse of a checking account for check kiting or other unlawful purpose, your repeated negligence in handling checks, electronic funds transfer devices or other financial instruments that results in a loss to us, or your failure to observe the conditions of any other agreement with the Credit Union.

### Escheat

If you have no activity on any account or loan with the Credit Union other than the posting of dividends and/or the assessment of fees, your accounts may become subject to escheat (surrender to the State of California) or, if your last address in our records is outside California, the laws of your state of residence. We will send you notice required by law if, due to inactivity, your accounts may become subject to esheat.

### Our Handling Accounts In Case Of Your Death or Incompetence

If you have an individual account, your death or a court appointment of a conservator to manage your legal affairs will terminate our authority to disburse funds from your account. Our authority will terminate ten days after the later of (1) the date of your death or the appointment of a conservator or (2) the date we learn of your death or the appointment of a conservator. After we learn of your death or incompetence, we will comply with the law or court orders in disbursing account proceeds, and we will honor stop pay requests by any persons claiming an interest in your account.

### SAVINGS ACCOUNTS

### Regular Share Savings Account

This account is required to maintain membership in the Credit Union. Please refer to the Truth in Savings Disclosure, Schedule of Fees and Charges and account opening receipt for details regarding minimum balance requirements, dividend rate and payment, and fees. Non-personal withdrawal and transfers are limited as explained in the "Deposits and Withdrawals" section of this Handbook.

### Youth Accounts

Our Board has adopted a Youth Account program with the goals of giving our young members the opportunity to acquire financial literacy, learn to manage accounts and credit in a responsible manner, and take advantage of the benefits of participation in the credit union community. They are available to children ages 6-18 in our field of membership, with additional privileges available to members ages 13 and up.

Youth Accounts owned by minors may require an adult joint owner, who must meet our credit and check history criteria. The Youth Account program includes paperless statements. If a Youth Account is opened online, enrollment is part of the opening. If a Youth Account is opened in person, the youth or adult joint owner will be required at that time to log onto our web site and enroll in Paperless Statements. Terms and benefits of Youth Accounts are subject to change. Consult the most recent Truth in Savings Disclosure and Fee Schedules for membership fee and other fees and for certain fee waivers. When a minor account holder reaches 19, all normal fees apply.

1. Ages 6 to 12

These members qualify for a regular share savings, special purpose savings accounts (which can be designated for specific goals such as vacation or car purchase), certificates and online access to their accounts. Debit cards are included in this account. One card is mailed to the adult joint owner to access the savings account.

2. Ages 13 to 18

Members in this age category enjoy the benefits available to youth members ages 6-12, including a debit card, plus a Checking account and a free box of checks.

### Premium Plus Money Market Savings Account (No New Accounts Offered)

Non-personal withdrawal and transfers are limited as explained in the "Deposits and Withdrawals" section of this Handbook.

### TERM ACCOUNTS

Term Accounts offer a fixed rate of return on a set balance over an agreed-upon term and can earn higher rates of return. Term, dividend rate and Annual Percentage Yield are set when you open the Account. See the Truth in Savings Disclosure and account opening receipt for details regarding account term, dividend rate and payment, early withdrawal penalties, renewal at maturity and other information. No additions to Term Accounts are permitted except during the grace period that follows maturity. Withdrawals (other than withdrawals of paid dividends) will be subject to early withdrawal penalties.

### Individual Retirement Accounts

Regular Share Savings Accounts and Term Accounts are available as IRAs. The terms stated in this Handbook will apply to the Regular Share Savings Account and Term Account IRAs, except that on Regular Share Savings Account IRAs, there is no minimum opening balance, and you will not earn dividends on any day on which the balance falls below $500. All IRAs are also subject to federal tax laws.

### Fiduciary Accounts

We can set up all our non-IRA accounts for special purposes such as family trusts, executors of estates, and guardians and conservators. Uniform Transfer to Minor Act accounts is also available. These accounts are subject to separate written agreements. Certain restrictions apply.

### SHARE DRAFT (CHECKING) ACCOUNTS

### General Checking Account Information

Checking accounts offer unlimited check-writing. All accounts except Health Savings Accounts offer a VISA® Debit Card (also known as Check Card). Please refer to the Truth in Savings Disclosure Schedule of Fees and Charges, and account opening receipt for additional information about features, minimum balance requirements, dividend rate and payment (if any), and fees related to checking accounts.

### Health Savings Accounts (HSAs)

Depending on your circumstances, you may be able to establish a health savings account that will allow you to build up savings to cover medical expenses not covered by insurance. See the Truth in Savings Disclosure, Schedule of Fees and Charges and account opening receipt for details regarding minimum balance requirements, dividend rate and payment, and fees.

Although called a "Savings Account," at San Francisco Federal Credit Union, HSAs are treated as checking accounts for most purposes. Overdraft protection is not available, neither under overdraft protection by agreement nor under courtesy pay privilege. We will debit fees and charges against the HSA, unless there are not sufficient funds to cover the fee. In the latter case we will charge the fee against your Regular Share Savings Account (S1), and if necessary take that S1 account negative. There is no limit on the number of monthly withdrawals. See the "Deposits and Withdrawals" section of this Handbook. Tax penalties may apply to unauthorized withdrawals; consult a tax advisor. HSAs require a special application, not available online.

The following terms apply to all Credit Union Checking Accounts.

*Payments on Checks.* We will make payments on current checks drawn on available funds in your Checking Account when signed by any person authorized on your Membership and Account Application. We will only honor completed, signed and endorsed checks, on blanks printed by us and given to you for your use or in a form approved by us. Spoiled checks should be destroyed or, if retained, disfigured. The duplicate in the checkbook should be marked "void."

*Governing Law.* In handling checking transactions we will be governed by the California Commercial Code, applicable Federal Board regulations and our Credit Union procedures, as changed from time to time.

*Stale Dated Items.* The Credit Union is under no obligation to pay a check on which the date is more than six months old. If we do pay it, we will not be liable to you for any costs or damages.

*Overdrafts.* The Credit Union is never required to pay a check or other checking account debit (withdrawal) item that would result in overdrawing on your checking account unless you have established and have available a source of overdraft protection. This section of the Handbook explains the way in which the Credit Union will handle overdrafts. Checking account holders are permitted and encouraged to establish overdraft protection by completing an Overdraft Protection Authorization on your Membership and Account Application. Overdraft Transfer Protection is not available on Checking accounts that are established as Health Savings Accounts.

If a check (share draft), ACH payment (debit), VISA Debit Card PIN or signature purchase or cash advance transaction, Preauthorized Transfer or Online Bill Payment is presented for payment on your checking account when you do not have available funds to cover it, the Credit Union will handle the item as follows.

1. If you have sufficient available overdraft protection from a source you have authorized (transfers from savings or advance from a line of credit), the Credit Union will take or advance funds from the share account or line of credit to pay the item. If you have multiple authorized overdraft protection sources with funds or credit available, the Credit Union may cover the overdraft from any source we select unless we have otherwise agreed with you in writing. The following rules also apply:

a. Overdraft protection transfers from your Regular Share Savings Account or Money Market Savings Account will be in $50 multiples, up to the available funds in the account. There is a limit of six such overdraft transfers per month per Savings Account. The minimum balance required to maintain the account is not available for overdraft protection. See the current Truth in Savings Disclosure for minimum balance requirements.

b. Overdraft protection transfers from your personal open end line-of-credit or VISA card line-of-credit will be posted as cash advances, in multiples of $100 (or the available credit), to cover your overdraft in the amount needed. Overdraft line-of-credit advances are governed by the terms of the applicable loan agreement.

c. We may assess fees for overdraft protection transfers from Regular Share Savings or Money Market Accounts, or for overdraft protection advances from lines-of-credit. Please refer to the current Schedule of Fees and Charges or the agreement governing your line-of-credit.

d. We will not be liable for failure to complete an Overdraft Protection

advance or transfer even though you have available funds or credit, if the failure results from a cause beyond our reasonable control such as a natural disaster.

2. If you do not have sufficient available overdraft protection from an authorized source, and if you meet our guidelines, the Credit Union can, at our sole discretion, pay or return or decline the item. We call this overdraft practice "Overdraft Privilege." (Attempts to withdraw cash in Credit Union branches or shared branches, or from ATMs, against insufficient funds will not be honored.) Our Overdraft Privilege Program will be disclosed to you separately when you open a Checking account. The following rules also apply to Overdraft Privilege:

a. We will charge the Paid NSF fee (sometimes called the "clearing fee" ) or the Returned NSF Fee for that item stated in the Fee Schedule, per item paid or returned, up to the daily maximum per transaction type. For example, if on one day several insufficient funds (NSF) ACH debits are presented and several NSF checks are presented, you will be assessed clearing fees and/or Returned NSF Fees up to the daily maximum  for both types. We will not charge you a fee for paying everyday debit card transactions (merchant point-of-sale or signature debit card transactions) that overdraw your account unless you have consented (opted-in) to our paying them. You may revoke that consent at any time.

b. You must restore any amount by which your account is overdrawn immediately upon our demand. If you do not, you will cease to meet our guidelines and we will discontinue Overdraft Privilege on your account. Our Right of Offset and our right to recover collection costs apply to our efforts to collect unrestored negative balances from you. If a negative balance remains outstanding more than 45 days, we may close your checking account.

c. If you prefer that we return unpaid any everyday debit card transactions (merchant point of sale or signature debit card transactions) items that you attempt to draw against insufficient funds when you do not have overdraft protection available from an authorized source (share account or credit line), or if you wish to opt out altogether from Overdraft Privilege, including for example  for checks, ACH and Bill Pay payments,  please let us know in writing; your election will not impact the availability of Overdraft Transfer Protection from authorized sources.

d. While Overdraft Privilege is always at our discretion, it will never be available in the following situations: i) your checking account is new; ii) you are in default on any obligation you owe us; iii) in our sole judgment you have initiated too many checking account withdrawal transaction against insufficient funds, or iv) the overdraft would cause your negative checking balance to exceed a limit we set internally.

3. Unless you have a formal overdraft protection arrangement with us, we can close your Checking Account without prior notice for repeated overdrafts or for your other misuse of the Account such as check "kiting."

4. You waive protest and notice of dishonor for nonpayment of deposited returned items.

5. You agree that we can post overdrafts to your account in the order of the sequence of the transactions received or in any other order as long as we comply with any applicable laws or regulations. We do not "structure" posting of items presented for payment to maximize paid or returned NSF fees.

6. Every joint owner of the account is equally responsible for making up deficiencies in the account balance.

7. Checks you wrote and that were returned on insufficient funds may

be re-presented by the payee for payment through the ACH (Automated Clearing House) system if the payee notifies you of this possibility when you write the check. These are called "RCK entries" and are electronic fund transfers. Checks on which the signature is forged, altered checks, checks for over $2,500, checks returned for reasons other than insufficient funds, or checks re-presented more than 180 days after their original date, are not eligible for ACH representment.

8. At our option, we have the right to automatically redeposit NSF items without notification to the parties. If an item you deposit is returned NSF, we can offset any resulting negative balance from any Credit Union shares in which you have an interest under our Right of Recovery. If we returned a check you wrote for insufficient funds, the institution at which the item was deposited may automatically redeposit the item without notice to the parties.

*Stopping Payment.* You can stop payment on any check drawn on your account before the check has been cleared for payment by notifying us orally and in writing. You must follow up the oral notice with a written request within fourteen (14) calendar days of the oral notice, or the stop payment request will lapse. Stop payment requests will be processed promptly, but the Credit Union will not be responsible for a check we pay within the first 24 hours after you request the stop pay. Written stop payment requests are valid for only six months but may be renewed for additional six-month periods by giving written notice to the Credit Union within the period during which the stop payment request is effective.

1. For us to effectively stop payment, we need to know the drawer, the payee, the account number, the date, the check number, and the exact amount of the check. Our computer will search for the check exclusively by account number and the check number. It can read nothing else on the check. If the account number or check number is wrong, no stop payment can be made.

2. If we fail to carry out a timely stop pay, we will not be obligated to reimburse you if the check paid your valid obligation. If we do reimburse you, the claim for funds against the payee of the check will be assigned to us and you agree to cooperate in collecting the amount wrongfully paid to the payee of the stopped check. Our liability to you is limited to the amount of the improperly paid check.

*Post Dated Checks.* Postdated checks may be cashed if presented by the payee before the date on the check. We will not be liable for the consequences of such early payment, unless you have given us separate notice (the date on the check alone is not sufficient notice) that the item is postdated and identified the check to us by providing the same information that we require for stop payment requests. Our responsibility for failing to carry out your instructions regarding a post-dated check is the same as if we paid a check over your stop payment order.

*Availability of Funds for Check Writing.* Non-cash deposits are made available only after the times specified in the "Funds Availability Policy" section of this disclosure. We consider these deposits uncollected funds until the hold period expires. Please postpone writing checks or attempting withdrawals against these funds unless you intend to rely on your overdraft protection.

*Prohibition on Pledging Funds.* Funds deposited in Checking Accounts may not be pledged as security for a loan.

*Lost or Stolen Checks.* If your checks are lost or stolen, please tell us immediately. Call us at 415.775.5377. We recommend that you close your check-

ing account and re-open it with a new number. Even if you stop payment on a sequence of lost or stolen checks, people who obtain your checks can obtain new checks with your account and routing number on them. If you elect to keep your account open under the same number after your checks are lost or stolen, the Credit Union will not be responsible for unauthorized checks paid on your account unless they fall within a sequence of check numbers on which you have stopped payment. If we determine that we have an unacceptable risk of loss, we can require you to reopen your checking account under a new number or terminate your checking account privileges.

*Immediate Check Payment.* Checks you write may clear within a matter of minutes or hours. You should be sure that you have available funds before writing checks. Do not assume that you can write a check and later make a deposit to cover it.

*Check 21 and Substitute Checks.* The Check Clearing for the 21st Century Act, otherwise known as Check 21, took effect in October 2004. This law allows financial institutions to "truncate" clearing checks by creating an electronic image of a check rather than using the original paper check. The electronic image is called a "substitute check." The substitute check includes the front and back of the original check and the legend, "This is a legal copy of your check. You can use it the same way you would use the original check."

*Preauthorized Drafts.* A preauthorized draft is created when you give someone (such as a telemarketer or a creditor to whom you owe money) your checking account number along with your routing and transit number and authorize them to use the information to debit your checking account for the amount of money you have agreed to pay them. Any preauthorized draft presented to the Credit Union after you have voluntarily given your checking account information to the payee is considered authorized by you, even though you have not signed a check.

*ACH Conversion of Other Checks.* Persons to whom you write checks may convert them to electronic fund transfers. This may occur when you write a check to a merchant (called a POP or point-of-purchase entry) or when you send a check to a creditor to pay a bill (called an ARC or accounts receivable entry). Creditors who convert your checks to ARC entries must permit you to opt out of such conversions.

## SPECIAL SERVICES

### CREDIT UNION CHECKS

If you obtain a check drawn on the Credit Union payable to someone other than yourself the Credit Union is, under normal circumstances, guaranteeing the payment of the check. For that reason we will accept a refund or replacement request on a Credit Union Check only after we receive a written declaration under penalty of perjury from you and, in some cases, the payee. If the check was lost, stolen or destroyed before you delivered it to the payee, you must sign the declaration. If the check was lost, stolen or destroyed after delivery to the payee, both you and the payee must sign the declaration.

If we receive the refund or replacement request after the check has cleared, we will not be responsible for the loss.

We will not issue a replacement check or credit your account until 90 days after the issue date of a Credit Union Check. If we do issue a refund or replacement sooner, we may require you to post, at your expense, a lost

19

Instrument bond.

If, after 90 days have passed, we issue a replacement check or re-credit your account, we are discharged from further liability. If a holder in due course presents the original check after that time, we must pay the proceeds of the original check to the holder or the financial institution. You agree that if this happens, and you do not pay us the amount of the original check immediately upon our demand, we can deduct the amount of the original check from any Credit Union shares in which you have an interest, and that if you do not have available funds for us to exercise our Right of Recovery, our general rights to collect what you owe us will apply.

## WIRE TRANSFERS AND REMITTANCE TRANSFERS

Wire transfer terms are different from other account agreements and terms. This section of the Handbook constitutes notice to all account owners of the rules regarding wire transfers. Wire transfers sent and received by the Credit Union are subject to the following terms:

We can make wire transfers from your share accounts and will carry out your written instructions. We will also receive wire transfers for you. Wire transfers are subject to the terms of Federal Reserve Regulation J and Article 4A of the Uniform Commercial Code; outgoing international wires may also be subject to the Remittance Transfers Rule in Consumer Financial Protection Bureau Regulation E. If a wire is subject to the Remittance Transfers Rule, you will receive a transaction disclosure when you initiate the wire.

1. If we are receiving a wire transfer on your behalf, our responsibility is to carry out the terms specifically as transmitted by the sending financial institution, including any specific security procedure.

2. We will not be liable for damages to you or a third party if we carry out the written instructions in a reasonable manner.

3. We have a right to rely on any account or routing numbers furnished by you as sender or any numbers transmitted with a wire transfer from another financial institution for your benefit with reference to the deposit of the funds received. Any effort we make to assist you in determining transit and routing numbers for institutions to which you wish to make wire transfers is provided as an accommodation only and accuracy is not guaranteed. You are responsible for the accuracy of names and routing, transit and account numbers on wire transfers you send.

4. We have no obligation to correct erroneous spellings of names or erroneous account numbers in sending or receiving wire transfer proceeds.

5. We will not be liable for indirect, consequential or punitive damages in the event that loss is sustained because we have failed to carry out instructions in a reasonable manner. Our liability is limited to the amount of the wire transfer.

6. Wire transfers will be reflected on your monthly statement.

   a. For domestic wire transfer, you agree to examine your statement promptly and notify us of any wire transfers errors with 14 days after the mailing date of the statement. If you do not notify us within 30 days of the mailing date of the statement, we will not be liable for any claims, demands or expenses related to the error.

   b. For international wire transfers (remittance transfers), If you think there has been an error or problem with your remittance transfer:

   • Call us at 415.775.5377; or

• E-mail us at contacts@SanFranciscoFCU.com.

You must contact us within 180 days of the date we promised to you that funds would be made available to the recipient.

When you do, please tell us:

(1) Your name and address or telephone number;

(2) The error or problem with the transfer, and why you believe it is an error or problem;

(3) The name of the person receiving the funds, and if you know it, his or her telephone number or address; and

(4) The dollar amount of the transfer; and

(5) The confirmation code or number of the transaction.

We will determine whether an error occurred within 90 days after you contact us and we will correct any error promptly. We will tell you the results within three business days after completing our investigation. If we decide that there was no error, we will send you a written explanation. You may ask for copies of any documents we used in our investigation.

What to do if you want to cancel a remittance transfer:

You have the right to cancel a remittance transfer and obtain a refund of all funds paid to us, including any fees. In order to cancel, you must contact us at the phone number or e-mail address above within 30 minutes of payment for the transfer. When you contact us, you must provide us with information to help us identify the transfer you wish to cancel, including the amount and location where the funds were sent. We will refund your money within three business days of your request to cancel a transfer as long as the funds have not already been picked up or deposited into a recipient's account.

7. You agree that if we receive an erroneous wire transfer to your account, the sending party can reverse the transaction and the amount of the wire transfer will be deducted from your account. We will notify you if this happens. If a wire transfer you receive is reversed, you agree to immediately restore any resulting overdraft to your accounts upon our demand. If you do not do so, you agree that we can recover any overdraft amount from any Credit Union share account in which you have an interest. You further agree that our rights under Collection Costs above apply if we cannot recover what you owe by exercising our Right of Recovery.

8. Unless we tell you otherwise, the cutoff time for wire transfers is 2:00 PM for transfers within the U.S. and 12:00 noon for international (non-U.S.) wire transfers. Only domestic payment orders, cancellations, or amendments received after the cutoff time will be processed during the next business day we are open. (We do not process wire transfers on Saturday even though we may be open to provide some services on Saturdays.)

9. Once a wire transfer has been sent, it generally cannot be canceled.

10. Your wire transfer requests may be delayed if you give us erroneous information.

11. We can refuse to carry out a wire transfer request or change order if we have reason to believe that doing so will cause us a loss.

12. In sending wire transfers for you, we will follow security procedures. If you make your request in person, we may require photo identification.

If you make your request by telephone, we may call you back at your telephone number in our records to confirm the request, and we may also ask you to confirm a telephone request by a signed authorization letter before the wire transfer is performed.

13. If a specific account type is not indicated, wired funds are posted to your Checking Account if you have one, or your Regular Share Savings Account if you do not have a Checking Account. It is your responsibility to verify that expected funds are posted to the appropriate account.

## FUNDS AVAILABILITY POLICY

All deposits are subject to verification and final collection. When you deposit an item (such as a check) drawn on another institution, there is always a time delay before the item reaches the institution on which it is drawn and we recover payment. The following summary is given to you to meet federal notice requirements of our Check Hold policy and a specific understanding of circumstances that might cause a delay in availability. Please read it and keep it for future reference.

Remember that even if we make funds available to you for a deposited item, if the paying institution lawfully returns the item unpaid or lawfully reverses an electronic direct deposit or wire transfer, we can deduct the amount of the deposit from your account balance and you will be liable for any resulting negative balance.

### DETERMINING AVAILABILITY OF A DEPOSIT

The length of a delay, if any, is counted in business days from the day of your deposit. Every day is a business day except Saturdays, Sundays and federal holidays. If you mail your deposit, we will consider the day we receive it to be the day of your deposit. If you make your deposit to a pro-prietary ATM or non-proprietary ATM on a Saturday, Sunday or Federal holiday, we will consider the next business day to be the day of your deposit. A proprietary ATM is an ATM that we own and is labeled as our machine. Deposits to a night depository are considered deposited the next business day.

If we do impose a delay, the length of the delay varies depending on the type of deposit and is explained below.

**General Rule :** Our policy is to make funds available on the next business day after the day the credit union receives a deposit with the exception of items listed under Same Day Availability below. We will give you a written notice if a Hold is being placed on any part of your deposit.

### Same Day Availability

Funds from the following deposits are available on the same business day as the day of your deposit:

1. Cash if deposited in person to one of our tellers or in person at a CU Service Center (shared branch).
2. Electronic direct deposits.
3. Checks drawn on San Francisco Federal Credit Union.
4. Wire transfers.

### Next Business Day Availability

Funds from the following deposits are available on the next business day after the day of your deposit if the deposit is made in person to a teller, received by mail, or deposited to a proprietary ATM or CU Service Center.

22

Deposits not made in person to a teller (ATM deposits, for example) are subject to verification.

1. U.S. Treasury checks, and California State, county, city or public agency checks.

2. Federal Reserve Bank checks, Federal Home Loan Bank checks, and U.S. Postal Money Orders, if payable to you and endorsed by you.

3. Cashier's, certified, and teller's checks, if payable to you and endorsed by you.

4. Cash (unless deposited in person to a teller, in which case it will have same day availability).

5. The first $200 of aggregate checks not subject to Next Day Availability.

### Other Check Deposits

The first $200 will be available on the next business day after the day of your deposit. The remaining funds will be available on the second business day after the day of your deposit. For example, if you deposit a check of $700 on Monday, $200 of the deposit is available on Tuesday. The remaining $500 is available on Wednesday.

### Deposits at Non-Proprietary ATMs

If you make a deposit at an ATM San Francisco FCU does not own or operate but which is on a network at which we accept deposits, the funds will be available not later than five business days after the business day of your deposit.

### Longer Delays May Apply

In some cases, we will not make all of the funds that you deposit by check available at the times shown above. If we are not going to make all funds from your deposit available at the times shown above, we will notify you in writing when you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to a Credit Union employee or if we decide to take this action after you have left the premises, we will mail you the notice by the day after we receive your deposit.

If you need your funds right away, ask us when the deposit will be available.

We can delay availability for any reasonable amount of time, generally no more than seven  business days (nine business days for checks deposited at non-proprietary ATMs ), if:

1. We reasonably believe a check you deposit will not be paid.

2. You deposit checks totaling more than $5,000 on any one day.

3. You have overdrawn your account repeatedly in the last six months.

4. You redeposit a check that has been returned unpaid.

5. There is an emergency, such as failure of communications equipment.

We will notify you if we delay your availability to withdraw funds for any of these reasons, and when the funds will be available.

### Special Rules for New Accounts

If you are a new member, the following special rules will apply during the first 30 days your account is open.

The first $5,000 from a deposit of U.S. Treasury checks will be available on the next business day after the day of your deposit. The excess over $5,000 will be available on the ninth business day after the day of your deposit. Funds from wire transfers into your account will be available on the next business day after the day we receive the transfer.

Funds from deposits of cash and the first $5,000 of a day's total deposits of cashier's, certified, teller's, travelers and state and local government checks will be available on the next business day after the day of your deposit, if the deposit meets certain conditions. For example, the checks must be payable to you. The excess over $5,000 will be available on the ninth business day after the day of your deposit. If you do not make the deposit in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from all other check deposits will be available on the ninth business day after the day of your deposit.

If we choose to accept a check as your agent for collection rather than to deposit it, these delay limits do not apply. The money will be posted to your account when we receive it.

### Special Rule for Mobile Deposit

If you qualify for the service, funds from checks deposited by Mobile Deposit will be available upon final collection from the institution on which the check is drawn, or earlier at our sole discretion. Factors we may consider in making funds from Mobile Deposits available prior to final collection include but are not limited to your account history with us and your average balances in accounts you have with us.

### Location of Check Endorsements

Federal law requires all check endorsements to be in the first 1-1/2 inches of the trailing edge of the back of the check. The trailing edge is opposite the left side of the face of the check, the side of the check just behind the address of the financial institution. You will be responsible for any costs or delays the Credit Union incurs because checks deposited to your account do not comply with the endorsement rules.

## ELECTRONIC FUNDS TRANSFER
## AGREEMENT AND DISCLOSURE STATEMENT

### INTRODUCTION/SCOPE OF SERVICES

Electronic Funds Transfers (EFTs) are payments to, or withdrawals from, your account that are started electronically. This agreement applies to transactions initiated by (1) ATMs (automatic teller machines) that display the logos of networks we designate from time to time, (2) ExpressLine Voice Response, (3) Online Banking including Mobile Banking Services and Bill Pay, (4) Point-of-Sale (POS) terminals that display logos of networks we designate from time to time, (5) third party electronic transfers into your account via Automated Clearing House (ACH) such as pension payments by direct deposit and payroll deduction, (6) transfers out of your account to third parties via ACH such as automated bill payment services, or (7) use of a VISA® Debit Card at participating merchants or ATMs that display logos of networks we designate from time to time. (Debit Cards are also known as Check Cards.)

### ELIGIBILITY

Eligibility for EFT services is conditioned upon your continuing to be a Credit Union member in good standing (including the deposit and maintenance of the required Regular Share Savings Account balance stated in the Truth in Savings Disclosure and meeting your loan obligations), and your account history with the Credit Union and other institutions must be satisfactory. You need not have a checking account with San Francisco Federal Credit Union to qualify for a Debit Card, but you must have a Credit Union check-

ing account to use your Debit Card for signature transactions or point-of-sale purchases.

## SECURITY OF YOUR ACCOUNTS: KEEP YOUR PERSONAL IDENTIFICATION NUMBER (PIN) AND PASSWORD SECRET

You can't use a VISA® Debit Card at an ATM or point-of-sale terminal without keying your Personal Identification Number (PIN) into the ATM or terminal after inserting your Card into the machine. Your randomly selected PIN will be given to you when you request a Debit Card. You may change your PIN if you wish by bringing your Card and valid identification to a Credit Union office. You may need to know your existing PIN to request a new one, but we recommend you store your PIN only in your memory. Keeping your PIN secret will keep an unauthorized person from taking money out of your Credit Union accounts. You can't use the ExpressLine Voice Response system or Online Banking without your secret PIN/Password, initially your social security number. Because this is an easy number for others to obtain, we recommend you change it immediately, following the ExpressLine or Online Banking instructions for doing so. Mobile Banking Services require a special PIN.

To keep your Passwords and PINs secret, please follow these simple rules. Memorize them, just as you learn a frequently called telephone number. Do not write your PIN on your Debit Card, and do not keep PIN/Passwords near telephones or your personal computer in your home or office. If you must write these numbers down, do so in a way that won't make it easy for someone to find them and know what they are. Don't let anyone use your Debit Card or watch you key in your PIN or Password. If you believe an unauthorized person has gained access to your PIN or Password, telephone the Credit Union immediately (see "HOW TO CONTACT US" at the end of this disclosure) and instruct us to deactivate/block the card or change your PIN. Remember that a PIN is not required to use a Debit Card for signature transactions. Treat your Debit Card as carefully as you treat cash.

## CONSENT TO TERMS

By applying for, keeping, signing or using any EFT device, you acknowledge receipt of this disclosure and you agree that your use of EFT services will be subject to its terms. If you don't want to use ExpressLine or Online Banking, or Mobile Banking (once it becomes available), call or visit the Credit Union and ask us to deactivate your PIN and/or password. If you don't want to use a Debit Card, cut all issued cards in half and return them to the Credit Union with a request that they be cancelled.

## EXPRESSLINE-AUTOMATED TELEPHONE ACCESS TO YOUR ACCOUNTS (VOICE RESPONSE)

Our ExpressLine Voice Response System lets you access your accounts electronically by touch-tone telephone from anywhere in the United States. We will give you instructions on how to conduct transactions on your account by phone.

### Available Services

By keying in your confidential PIN and the proper command on a touch-tone phone, you will be able to: 1) transfer funds between your Regular Share Savings, Checking, and Money Market Accounts, 2) make loan payments by direct transfer from your Regular Share Savings, Checking or Money Market Accounts, 3) obtain account information, including posting of transactions, loan status, account balances, dividends, last deposit and check clearance status, savings and loan rates, loan terms, or 4) request withdrawal by check payable to you from your Regular Share Savings Account (the check

will be mailed to the primary member at his/her address of record). Other related services may be added upon notice to.

Generally, the ExpressLine Voice Response System is available seven days a week, twenty-four hours a day. The only time you will not be able to access your account is during computer system maintenance.

### Limitations on ExpressLine Use

Federal regulations limit certain non-personal transfers by telephone from your non-transaction accounts to six transactions per month (see the section entitled "Deposits and Withdrawals" in this Handbook). ExpressLine transfers are considered non-personal.

### Unauthorized ExpressLine Transactions

Notify the Credit Union immediately if you believe an unauthorized person has gained access to your secret ExpressLine PIN. You should also change your PIN immediately. Call ExpressLine to obtain instructions for changing your PIN by telephone. If you believe an unauthorized person has obtained your PIN and used it to change your ExpressLine PIN, please call the Credit Union (see "HOW TO CONTACT US" at the end of this Handbook) to close your accounts to ExpressLine access. See "Unauthorized Transactions" in the "TERMS APPLICABLE TO ALL EFTs" section of this disclosure for information on how to contact the Credit Union and other information on your potential liability for unauthorized transactions.

### Additional Terms Applicable to ExpressLine

Please read the section below entitled "Terms Applicable to All EFTs" carefully. These terms apply to ExpressLine.

### ON-LINE BANKING, BILL PAY AND MOBILE BANKING

You can use your PC for a variety of transactions. You must have a personal computer with the following system requirements to use Online Banking and Bill Pay:

1. Internet Access
2. Versions of browsers that are most compatible with online banking: Internet Explorer 7.0 and Higher (PC only); Mozilla Firefox 3.5 and Higher (PC and Mac); Safari 3.1 (WebKit 523.13) and Higher (PC and Mac); Google Chrome (PC and Mac).

You must have a Credit Union Checking Account to use Bill Pay. Mobile Banking Service is part of Online Banking and requires a mobile device connected through an internet or mobile service provider with a web browser, and a special software application downloaded to your mobile device.

### Available Services

By following the instructions that appear on the screen, you can use Online Banking on your home computer. At the present time, you may use Online Banking to:

* Transfer funds between your checking, savings and loan accounts.
* Transfer funds to accounts of other accounts of which you are an owner.
* Transfer funds to external financial institutions.
* Review account balances, transaction history and tax information for any of your checking, savings or loan accounts.
* Download your account information to financial management software programs like Quicken®, Quickbooks® or Microsoft® Money.
* Set email or text alerts to stay on top of your financials.
* Communicate with San Francisco Federal Credit Union using the

secure Communications Center.

With Bill Pay, you can pay your bills on-line without writing checks, saving you time and postage. By accessing Bill Pay through Online Banking, you can make a single payment, set up recurring manual payments that vary in amount, or set up automatic payments in the same amount at the same frequency (such as monthly or bi-weekly) to merchants.

With Mobile Banking, you can use a mobile device such as iPhone or Android (i) transfer funds between your Checking, Savings and signature credit line accounts, (ii) find out if checks have cleared, and (iii) verify account balances. If you are approved, you may use your mobile device for Mobile Deposit (see "Deposits and Withdrawals.")

Online Banking, Bill Pay and Mobile Banking are generally available 24-hours a day, seven days a week, although the system may from time to time be shut down for maintenance.

If you do not want to use Online Banking and Bill Pay, please call or visit the Credit Union and ask us to disable online banking access. If you want to cancel the Bill Pay service, you can select the "Stop Bill Pay" option in Bill Pay at any time. If you want to cancel Mobile Banking, you use Online Banking to do so or call the Credit Union at any time.

### Activating On-Line Banking, Bill Pay and Mobile Banking

Log into Online Banking by following the instructions that appear on the screen. Instructions will be provided in Online Banking.

To activate Bill Pay, sign on to Online Banking by entering your Online Banking password and follow the tab to Bill Pay. The first time you log into Bill Pay, you will be required to agree to the terms of the on-line banking disclosure to proceed. Bill Pay will give you complete instructions on setting up payments.

To access Mobile Banking, you must first enroll in Online Banking, and follow the link to the Mobile Banking Environment.

Once you have enabled the Mobile Banking service, you must download the Credit Union's mobile banking application (the "Software") onto your mobile device. You can then use your mobile device to access your accounts at anytime by entering your member number and password.

### Limitations on On-Line Banking, Bill Pay and Mobile Banking Use

All transactions are limited to available funds in your accounts. Single Bill Pay payments cannot exceed $9,999.99. You can pay as many bills as you like, but you can have no more than 250 merchant payees set up at any one time. Online Banking transfers out of your Regular Share Savings and Money Market Savings Account are limited to six per month. (See the "DEPOSITS AND WITHDRAWALS" section of the Handbook for details on withdrawal limits.) Bill Pay payments can be made only to U.S. merchants and only in U.S. Dollar denominations. Bill Pay cannot be used to pay money you owe to governmental entities such as taxes, or to make court-ordered payments such as child support. If you have available overdraft protection by agreement we will make account transfers or loan advances to your Checking Account to cover Bill Pay payments that would otherwise overdraw your account.

### Special Bill Pay Instructions

You are responsible for providing us with complete and accurate information about the merchant you wish to pay (a) when you first set up the

account on Bill Pay and (b) if merchant information changes. Bill Pay will give you detailed instructions about what information is required. We do not verify the accuracy of merchant information.

You tell us the date that your payment is due. We will deduct the necessary funds to make the payment from your account at the start of business two to five business days before the payment is due. We will attempt to send the payment to the merchant by check or electronic transfer on the day we deduct the funds from your account. Whether your payment is made by check or electronically, you must have funds available in your account to make the payment by 12:01 a.m. five business days before the payment due date. If you are setting up a new payment, and the payment is due in less than five business days, we will deduct the funds from your account at the start of business on the business day after you set up the payment. If you want us to send a same-day payment, your request must reach us before 12:01 a.m. on that business day. The merchant may not receive the payment on time if we do not have complete and accurate instructions and funds by 12:01 a.m. five business days before the payment is due. If you intend to rely on funds from direct deposit to make a bill payment, be aware that we do not receive those funds until after the funds are deducted from Bill Pay.

If our first attempt to make a Bill Pay payment fails due to insufficient funds or other reason, we attempt the payment a total of five times. If we are still unsuccessful, we will charge our standard returned share draft fee to your account. We will not be responsible for late payments if you fail to observe these time limits or if you do not provide us with complete and accurate merchant information. You can cancel a bill payment by clearing the "due date" and "payment amount" fields or deleting the merchant from Bill Pay at any time before funds are withdrawn from your account. However, once the funds are withdrawn from your account, electronic payments cannot be stopped and you will have to resolve any disputes directly with the merchant. It may be possible to stop a payment by check if we receive your request before the merchant cashes the check. We will make reasonable efforts to stop check bill payments but cannot guarantee that we will be able to do so.

The Credit Union will be responsible for late fees only if we fail to follow your timely, complete and accurate instructions. You will be responsible for any late fees that occur because you have not given us accurate or complete information, because you do not have sufficient available funds in your account by 12:01 a.m. five business days before your payment due date, because you have not instructed us to make the payment on time, because a check we mailed was lost or misdelivered by the postal service, or if you did not select a payment due date on the business day of or prior to the actual due date.

### Documentation of Bill Pay Transactions

You can view and print up to 18 months of on-line bill payment history in the "View Bill History" feature (located under the "Recent Payments Module.") Click on the "Biller Name" column header to sort billers alphabetically and group all payments made to that biller for the selected time frame. Documentation of individual payments will be provided on the monthly statements for the months in which the payments are withdrawn from your account. You can also use On-line Banking to review your account history (including Bill Pay payments) or call 866-820-8037 to find out if a scheduled bill payment has been deducted from your account.

## Special Mobile Banking Software Terms

After enrollment in Mobile Banking, your use of the mobile banking Software is subject always to the following conditions: **a**. You will not use the Software for any purpose other than to access your own account(s) via the Mobile Banking service on your own mobile device; **b**. You will not download or install the Software into a mobile phone which you do not own or over which you do not have exclusive control; **c**. You will not permit or enable any person to access the Software, or leave your mobile device unattended in such a manner as to enable a person to access the Software; **d**. You will not reproduce, modify or reverse engineer the Software or permit another person to do so; **e**. You will not permit any person to access your password or otherwise enable him to download a copy of the Software; **f**. The Software is made available to you strictly on an "as is" basis, no warranty is made in relation to the Software, and all warranties which may be implied by law or custom are excluded; and **g**. You will not hold the Credit Union liable for any incompatibility of the Software with your mobile device or for any loss or damage to any mobile device which may be caused by the Software or the installation process.

## Unauthorized On-Line Banking Transactions

Notify the Credit Union immediately if you believe an unauthorized person has gained access to your secret Online Banking password . You should also change your password immediately by using Online Banking and following the instructions. If you believe an unauthorized person has used your password to change your password, please call or visit the Credit Union immediately. See "Unauthorized Transactions" in the "TERMS APPLICABLE TO ALL EFTs" section of this Handbook for information on how to contact the Credit Union and other information about your potential liability for unauthorized transactions.

## Fees

See the current Schedule of Fees and Charges for any fees that may apply to Online Banking or Bill Pay. There are no special or extra fees for Mobile Banking within Online Banking.

## Additional Terms Applicable to On-Line Banking, Bill Pay and Mobile Banking

Please read the section in this Handbook entitled "TERMS APPLICABLE TO ALL EFTS" carefully. These terms apply to Online Banking (including Mobile Banking) and Bill Pay.

## Online Banking and Personal Computer Security

We use web browsers that are capable of conducting a secure session with an SSL (Secure Sockets Layer) enabled web server. This means that data transmitted between your computer and our server is scrambled during transmission. When the data finally arrives at our server, it is unscrambled. You might find the following measures, which are commonly recommended, helpful in securing your personal and financial information.

*Try to create original passwords*:

- Use a combination of numbers, letters and punctuation
- Longer passwords are better
- Make sure your password is something you can remember without writing it down

Memorize your password

Keep your computer's security and anti-virus protections up to date, and back up important data. Use anti-virus software and firewalls. An information technology professional that you contract can help you select appropriate protective systems and backup media.

Avoid E-mail Scams: All internet users should be aware of the online scam known as "phishing" (pronounced "fishing"). Phishing involves the use of e-mail messages that appear to come from your bank or another trusted business, but are actually from imposters.

Phishing e-mails typically ask you to click a link to visit a web site, where you're asked to enter or confirm personal financial information such as your account numbers, passwords, Social Security number, credit card numbers, debit card number, PINs or other data. Although these web sites may appear legitimate, they are not. Thieves can collect whatever data you enter and use it to access your personal accounts.

PLEASE NOTE: San Francisco Federal Credit Union cannot and does not warrant the security of any online environment, nor do we warrant the performance of your computer equipment or software or the Mobile Banking software.

## DEBIT CARDS

A Debit Card (also known as a Check Card) bears the VISA® logo, but it is not a credit card. A Debit Card enables you or anyone you authorize to use the Debit Card to order the Credit Union to make payments from your linked Credit Union Checking Account without writing a check. If you have a checking account you can use the Debit Card to pay participating merchants for goods or services, either through a point-of-sale terminal displaying the logo of a network we have designated or by a signature transaction. You can also use a Debit card with a checking, savings, or money market account to obtain cash from ATMs, that display logos of networks we have designated. Use of the Debit Card authorizes the Credit Union to charge your Checking Account or another account you designate at an ATM, access for the full amount of the transaction plus any applicable service fee as soon as the transaction posts to your account. There is no deferred payment as there is with a credit card.

## Available Debit Card Services - Signature Transactions

You can use your Debit Card to access your linked Checking Account to purchase goods and services from participating VISA® merchants and obtain cash from financial institutions displaying the VISA® logo, on signature transactions. We can add other services by giving you any notice required by law.

## Available Debit Card Services - PIN Transactions

You can also use your San Francisco Federal Credit Union Debit Card to withdraw cash, from your linked Regular Share Savings or Money Market Savings and Checking Account. Withdrawals are available at proprietary ATMs and at non-proprietary ATMs on networks in which we participate. You can use your Debit Card to make purchases or withdraw cash from your linked Checking Account for point-of-sale (POS) transactions at terminals on networks in which we participate. You can also use your Debit Card at proprietary ATMs and ATMs on certain networks to transfer funds between linked accounts and make deposits to your linked accounts. Proprietary ATMs are ATMs that we own and operate. The logos of ATM networks and point-of-sale networks in which we participate are shown on the back of

your Debit Card. We will tell you the daily limits we assign to your Debit Card for Signature and PIN-based transactions.

## Debit Card Transaction Limits

All Debit Card transactions are limited to your assigned daily limits or the available funds in your account, whichever is less.

You can designate one Savings Account (or Money Market Account if you have a legacy Money Market Account) and one Checking Account to access at ATMs with your Debit Card. You can access your designated non-Checking Accounts only at ATMs. Merchant and point-of-sale transactions can access only your Checking Account.

If you have a Debit Card with only a Savings Account linked, you will be able to conduct ATM transactions only. Signature and POS transactions are only available with a linked Checking Account.

Until the earlier of (1) five days from the date of the merchant transaction or (2) the merchant authorization clearing your account, your total authorization limit will be reduced by the amount of the merchant authorization. After the transaction clears, your total authorization limit will be permanently reduced by the amount of the transaction plus any applicable fees, although additional deposits to your Checking Account will of course increase your total authorization limit after they have cleared.

Although you have sufficient funds in your Checking Account to cover a requested withdrawal, it may be possible that an ATM, merchant, financial institution or other entity that honors the Debit Card will not be able to determine your actual balance. Therefore, the Credit Union will not be liable for the refusal or inability of any such ATMs or entities to allow you to use your Debit Card or for their retention of your Card.

All use of your Debit Card must be backed by actual available funds in the Credit Union account you are accessing. If you have been approved for overdraft protection on your Checking Account, we will make a loan advance or transfer funds from the account(s) you have designated that will be sufficient to cover any negative Checking Account balance due to a Debit Card checking withdrawal. Funds to cover overdrafts will be transferred from the source(s) you have designated for overdraft protection in any order we choose consistent with applicable law. If you do not have available funds in your Checking Account or available overdraft protection from a share account or line of credit, and you have not opted in to Overdraft Privilege for everyday debit card transactions, the transaction will be declined and a returned NSF fee may be charged. If you have opted in to Overdraft Privilege for everyday Debit Card transactions, the transaction may be paid or declined at our sole discretion. Fees may be associated with any overdraft or attempted overdraft using your Debit Card; please refer to the Schedule of Fees and Charges.

A Hold may remain on funds in your Checking Account even after a Debit Card transaction is cleared. For example, if a Debit Card authorization is obtained in advance for several nights at a hotel, but actual charges are put through one night at a time, a Hold might apply to both the total advance authorization and the charges for the individual nights. The Credit Union will make every effort to avoid this, but you should be aware of this possibility.

## Checking Account Terms Apply to Debit Card

Use of the Debit Card will be treated as though it were a check and will also be governed by the terms of your Checking Account agreement with the Credit Union, plus any Checking Account overdraft protection agreement you

31

have with the Credit Union, except that:

1. the Credit Union may charge withdrawals to the Checking Account in any order it determines consistent with the law. If funds are not sufficient to cover all withdrawals, the Credit Union may pay Debit Card withdrawals and dishonor regular checks, and

2. the Credit Union cannot honor stop payment requests on Debit Card transactions.

Under our Overdraft Privilege program, if you opt in , we may at our discretion pay overdrafting debit card transaction, except that (1) we do not pay overdrafting transactions attempted at ATMs and (2) we will not charge you a fee (paid NSF fee) on everyday transactions (merchant point-of-sale or signature debit card transactions) that overdraft your account unless you have an opt-in/consent in effect.

## Transaction Dispute Rights - Applicable to Debit Cards

VISA operating rules give you certain rights to dispute merchant transactions. You must first make a good faith effort to resolve the dispute directly with the merchant. If you are unable to resolve the dispute directly with the merchant, notify the Credit Union at once. You must tell us within 60 days of the date on which we sent you the FIRST statement on which the disputed transaction appeared. Include copies of any documents that reflect your efforts to resolve your dispute with the merchant.

The Credit Union will arrange to have the dispute investigated to determine whether you have the right to have your account credited for the amount in dispute. The Credit Union will, at a minimum, provisionally recredit your account for the amount of your dispute so that you will have use of the funds within 10 business days (20 business days for new accounts). It may take up to 45 days (90 days for Point of Sale or foreign transactions or on new accounts) to make a determination. Your account will be provisionally recredited in 5 days if the dispute involves unauthorized use of your VISA Debit Card and your account is not new.

If you do not submit your dispute in writing within 10 business days after we ask you to do so, we are not required to credit your account during the investigation. If it is determined that you are entitled to a credit to your account, the Credit Union will post it (or change a provisional credit to a permanent credit) within 1 business day of the determination.

If VISA operating rules do not allow a credit to your account, any amount for which your account was provisionally credited will be deducted from your account. We will notify you if this happens, and will pay any items that overdraw your account for 5 business days after we send you this notice without imposing an overdraft fee, but only to the extent the overdrafts are equal to or less than the amount of the provisional credit we deducted from your account. If any item overdraws your account by more than the amount of the provisional credit, you will be charged an overdraft fee. You agree to immediately restore to the Credit Union the amount of any overdraft on your accounts.

Your rights to dispute merchant transactions through the Credit Union are limited to those provided by VISA's operating rules.

## Other Debit Card Terms

Although other documents you may receive when you initiate transactions with your Debit Card, such as sales receipts, may have contract terms printed on them, your agreement with the Credit Union is limited to the terms

In this agreement plus your Credit Union Checking Account Agreement and any overdraft protection agreement applicable to your Credit Union Checking Account.

## Debit Card Fees

The use of the Debit Card at ATMs may be subject to a fee. Third party ATM operators may impose fees for use of their ATMs. They are required to disclose these fees to you at the ATM before you complete your transaction and become obligated to pay the fee. Once you complete your transaction, the third-party ATM operator fee will be deducted from your account.

Although there is no annual fee applicable directly to the Debit Card, the Checking Account with which the Debit Card is linked may have monthly maintenance fees and may impose fees for ATM or Point-of-Sale (POS) or signature Debit Card use which will also apply to the use of your Debit Card. Please refer to the Schedule of Fees and Charges for fees that apply to Debit Card transactions.

International Transactions. For international multicurrency transactions (1) the exchange rate between the transaction currency and the billing currency (U.S. dollars) will be either (a) a rate selected by VISA from the range of rates available in wholesale currency markets for the applicable central processing date, which rate may vary from the rate VISA itself receives, or (b) the government-mandated rate in effect for the applicable central processing date, and (2) VISA will add a 1% International Service Assessment (ISA) fee to the transaction amount, and we will pass the fee on to you. For international single currency transactions processed in U.S. dollars, VISA will add a 0.80% ISA fee to the transaction amount, and we will pass the fee on to you. The ISA fee does not apply to single currency transactions conducted in US military bases, territories, embassies, or consulates, or to single currency fund transfers conducted by the cardholder.

## Liability for Unauthorized Use of Debit Cards

Your liability for unauthorized use of your VISA® Debit Card use is determined by VISA USA's operating rules. If unauthorized use of your VISA Debit Card occurs at certain POS terminals or ATMs, your potential liability for unauthorized use is that set out below in the "Unauthorized Transactions" part of the "TERMS APPLICABLE TO ALL EFTs" section of this Agreement. Except for certain POS or ATM activity, you will have no liability for unauthorized use of your VISA® Debit Card. You agree to promptly report the loss or theft of your VISA® Debit Card whether or not you may be liable for its unauthorized use. It benefits all Credit Union members if losses due to unauthorized card use claims are kept to a minimum.

## Additional Terms

Please read the "TERMS APPLICABLE TO ALL EFTS" sections of this disclosure very carefully. They apply to the Debit Cards.

## AUTOMATED CLEARING HOUSE (ACH) SERVICES

ACH transfers are regular automatic deposits into your account, such as direct deposit of your payroll or retirement benefits, and regular automatic payments out of your account, such as transfers to pay health club dues. ACH transfers will occur only if you authorize the originating company in writing. You agree to the additional agreement and disclosures specified in the separate ACH form.

Although you can call the Credit Union for information about the transfer, your only documentation of the transfer will be an entry on your periodic statement.

## Available ACH Services

ACH may be used to make deposits, and to make loan payments, on dates and in amounts that you specify.

## Preauthorized Debits (Withdrawals)

You may arrange with the Credit Union and other third parties in advance to make regular preauthorized electronic payments, such as mortgage payments or insurance premium payments. If the scheduled transfer date falls on a holiday, the transfer will take place on the prior business day.

If you have authorized the Credit Union to initiate debits from your account at another institution, and debits are returned for the second time, we will cancel your authorization.

## Preauthorized Credit (Deposits)

Upon instruction of your employer, the Treasury Department, or other financial institution, the Credit Union will accept direct deposits of your paychecks or of recurring Federal payments, such as Social Security. If you have arranged to have a direct deposit made to your account at least once every sixty (60) days from the same source and you do not receive a receipt (such as a pay stub), you can find out whether or not the deposit has been made by calling 415.775.5377.

## Limitations on ACH Services

For deposits, the payor (the person or entity that pays you money) must offer direct deposit. For payments, the creditor (the person or entity to whom you pay money) must accept payments via ACH transfer. ACH payments out of your non-transaction accounts are limited to six per month (see Deposits and Withdrawals above for further information).

## Right to Stop ACH Payments

If you have preauthorized ACH payments out of your account, you can stop any of these payments by calling, visiting or writing the Credit Union at the locations indicated in the "How to Contact Us" section of this Handbook, in time for us to receive your request three (3) business days or more before the payment is scheduled to be made. A stop payment request for an electronically converted check must reach the Credit Union in a reasonable time for us to act on it. We may also require you to complete an ACH Stop Payment Form and deliver to us within fourteen (14) days. If you fail to confirm your oral request, it may lapse. We will charge you a fee for each stop payment order you give us as set forth in the Schedule of Fees and Charges.

This stop payment is for one ACH payment/debit, or for a limited series of such debits from one payee, only. Because this is not a request to stop all future payments, the Credit Union and you can expect subsequent payments to be initiated. (To stop or cancel all future payments, you must contact the originator or the third party whom you initially authorized, even though you may initiate such a "revocation of authority" with us.) A stop payment order will remain in effect 1) until payment of the entry (or the last of several stop-requested entries if applicable) has been stopped, or 2) until the member withdraws the stop payment order in writing, whichever occurs first.

If you order us to stop a pre-authorized ACH payment three (5) business days or more before the transfer is scheduled, and we do not do so, we will be liable for your actual damages, not to exceed the amount of the payment. The Credit Union will not be liable for failing to stop payment if the information you give us does not describe the payment accurately enough for us to find it and stop it.

## Notice of Payments in Varying Amounts

If your regular payments vary in amount, the person you are going to pay is responsible for notifying you of the amount at least ten days in advance of the scheduled payment date. You may tell the person to whom you make payments that you only wish to receive this notice when the payment amount will vary by more than a specified amount from the previous payments, or when the amount would fall outside certain limits that you set.

## Corrections and Payment Revocations

If an ACH transfer is made into your account in error (if, for example, your employer inadvertently makes a double direct deposit of your net pay) you agree that we can reverse the erroneous transfer into your accounts without giving you advance notice. We will, however, tell you after the fact if such a correction is made. If reversal of an erroneous ACH deposit to your account results in an overdraft, you agree to immediately restore the account to a positive balance after receiving our written demand. If you do not do so, you agree that our Right of Recovery and our right to recover Collection Costs will apply.

Credit that we give you for an ACH credit entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive final settlement, we are entitled to a refund of the amount credited to you in connection with such entry, and the party making payment to you via such entry (i.e., the originator of the entry) shall not be deemed to have paid you the amount of the entry.

## Unauthorized/Authorization Revoked Transactions

If you want to reverse an ACH debit, you must complete and sign a written statement under penalty of perjury (affidavit) within 15 days after we send or make available to you the periodic statement that reflects payment of that ACH debit. If we receive a properly completed and signed written statement under Penalty of Perjury from you within the 15-day period, we will re-credit your account with the amount of the charge. The written statement under penalty of perjury includes permissible reasons for which an ACH debit may be reversed.

Please contact us by calling, visiting or writing us at the locations indicated in the "How to Contact Us" section of this Handbook.

## Other ACH Transactions

A CIE or customer-initiated entry occurs when you initiate an electronic transfer of funds to pay a company to whom you owe money, such as through use of Bill Pay. Bill Pay will tell you whether your bill is being paid electronically or by check. A PBR or consumer cross-border payment occurs when ACH credits (deposits) or debits (withdrawals) are initiated on your account involving foreign countries. Debits entries involving foreign countries will be subject to Remittance Transfer rules, covered in the Wire Transfers section of this Handbook.

A TEL entry is initiated when you give oral authorization over the phone to initiate an ACH withdrawal from your account. This is distinct from a preauthorized draft (described in the Checking Account section of this Handbook), which authorizes a payee to initiate a check (draft) payment on your account. A TEL entry is permitted only if you have an existing relationship with the payee or if you initiated the call to the payee. A TEL entry may authorize a single payment or recurring payments.

A WEB entry is initiated when you give authorization over the internet (not using Online Banking or Bill Pay) to initiate an ACH withdrawal from your account. WEB entries may authorize a single payment or recurring payments.

## Electronic Check Conversions

You may authorize a merchant or other payee to make a one-time electronic payment from your checking account using information from checks you write to make purchases or pay bills. For merchant purchases, the merchant is required to post a clear and conspicuous notice that they may convert checks you write to electronic payments. For bills, the billing entity is required to provide a notice on the bill that checks submitted for payment may be converted to electronic payments. If you believe that an electronic fund transfer has been made without your permission using information from your check, tell us **AT ONCE**, just as you would if you believe your Check/Debit Card, PIN or secret code has been lost or stolen or may be subject to unauthorized use. See **Unauthorized Transactions-all EFTs** below.

## TERMS APPLICABLE TO ALL EFTS

### Responsibility of Transactions

1. You must have both your Debit Card and your personal identification number to access your Credit Union accounts through any ATM or POS terminal. You must have your PIN/Password to use ExpressLine or Online Banking and Bill Pay.

2. If you authorize us to issue a duplicate Debit Card to someone, or if you give your Card, PIN or ExpressLine PIN or Online Banking and Bill Pay Password to another person, you are authorizing that person to withdraw funds and perform other transactions on your accounts covered by this agreement regardless of whether you have otherwise authorized that person. Adult joint owners on Youth Accounts are responsible for authorized Debit Card transactions including those conducted by the youth. This rule also applies to any other EFT service that may become available in the future.

3. You consent to the terms of this agreement by using any EFT access device (such as a Debit Card, ExpressLine PIN or Online Banking Password). You continue to be bound for all transactions resulting from the use of the Debit Card, ExpressLine PIN, or Online Banking and Bill Pay Password until you give us written notice to deactivate the device and, if it is a physical device such as a plastic card, return it to us.

   (a) Any person who applied for the Debit Card, ExpressLine PIN, Online Banking and Bill Pay Password, or signs a Debit Card, or uses an EFT device for transactions, is equally obligated (jointly and severally) with any other such person to meet the terms of this agreement.

   (b) You are also obligated to repay any charges resulting from the use

36

of the Debit Card, ExpressLine or Online Banking and Bill Pay by another person with your express or implied permission, whether or not the person stays within the limits of use set by you.

(c) Any persons who use the Debit Card, ExpressLine or Online Banking and Bill Pay are also obligated to repay the Credit Union for all charges incurred because of their use of the access device.

(d) You remain bound to pay for charges under this agreement even though another person has been directed to pay the debt by agreement or court order such as a divorce decree. No release from the obligation to pay debts incurred as a result of electronic fund transfer transactions will be valid unless (i) in writing signed by an authorized Credit Union employee or (ii) pursuant to a court order in an action to which the Credit Union is a party.

4. You understand and agree that if you or anyone you authorize to use the Debit Card, ExpressLine or Online Banking and Bill Pay gives conflicting instructions on the ATM keypad and written instruction inserted into the ATM such as a deposit slip, the Credit Union will follow the instructions given on the keypad.

5. You agree that if you or anyone acting with you uses your Debit Card, ExpressLine or Online Banking and Bill Pay with fraudulent intent, we consider that transaction to have been authorized by you.

## Documentation of Transactions

Each time you use a Debit Card at an ATM, you will receive an acknowledgement receipt describing the transaction (unless the machine notifies you that receipts are not available or, at some machines, you elect not to get a receipt). You will also get a receipt when you use your Card at a Point of Sale terminal or for a signature transaction. If you use your Debit Card for telephone or Internet purchases, your only record may be your monthly statement. Keep your receipts to update your records and verify your monthly statements on which these transactions will also appear. ExpressLine and Online Banking transactions are reflected only on your monthly statement.

## Excess Withdrawals

Withdrawals or transfers must be backed with actual available funds. If you have been approved for overdraft protection, we will make a loan advance or transfer funds from your designated overdraft protection account source sufficient to cover any negative account balance, up to your available credit limit or the available balance in your account, depending on the overdraft protection source(s) you have. Funds will be advanced or transferred from the sources you have designated on your Membership and Account Application, Debit Card application, or supplemental Overdraft Authorization Card in any order we determine consistent with applicable law. Unless you have overdraft protection, cash may not be dispensed if available funds in the accessible accounts are not sufficient. It is your responsibility not to attempt to withdraw cash against deposits that have not yet cleared in the time permitted by the law and the Credit Union procedures. If any account of yours has a negative balance because of EFT activity, you agree to immediately restore your account to a zero or positive balance.

## Unauthorized Transactions - All EFTs

### Your Liability for Unauthorized Use

Tell us AT ONCE if you believe that your Debit Card, PIN, ExpressLine PIN, or Online Banking secret Password, has been lost or stolen or otherwise made

37

available to an unauthorized person, or that someone has transferred or may transfer money from your account (for example by using information from a paper check converted to an electronic check) without your permission. Please refer to the "HOW TO CONTACT US" section at the end of this Handbook for how to provide this notification. Telephoning is the best way of keeping losses down. You could lose all the money in your account, plus your maximum overdraft line of credit if you fail to promptly report unauthorized ExpressLine or Online Banking use, or the unauthorized use of a Debit Card for certain POS or ATM transactions.

If you believe your debit card or Expressline PIN, or your Online Banking secret Password has been lost or stolen or otherwise made available to an unauthorized person, and you **tell us within two (2) business days** after you learn of the loss or theft, you can lose no more than $50, if someone used your Card and PIN for certain ATM or POS transactions, or your Password without your permission.

However, if you **DO NOT tell us within two (2) business days** after you learn of the loss or the theft or other unauthorized dissemination of your Debit Card or Expressline PIN or Online Banking secret Password, and we can prove we could have stopped someone from using your Card and PIN for certain unauthorized ATM or POS transactions or your Password without your permission, you could lose as much as $500.

If you live in California, and unauthorized Debit Card transactions that fall outside VISA's "zero liability" rule occur, your maximum liability will be $50 unless the following paragraph also applies.

If your statement shows transfers that you did not make, tell us at once. **If you do not tell us within sixty (60) days after** the statement was mailed to you, you may not get back any money you lost after sixty (60) days, if we can prove that we could have stopped someone from taking the money if you had told us in time. That means you could lose all the money in your account *plus your maximum overdraft line of credit.*

If a good reason (such as a long trip or a hospital stay) kept you from telling us, we may extend the time periods.

If unauthorized use is made of your Debit Card for transactions other than certain POS and ATM transactions specified in VISA USA's operating rules, the VISA "zero liability" rule applies, and you will have no liability for it.

Please remember: Any person who receives an additional Debit Card at your request, or to whom you give your Card and/or PIN, or whom you permit (either by express or implied permission) to use your PIN, Card or ExpressLine PIN would be able to withdraw *all of the money in your account.* We refer to such persons as authorized users, and you agree that all authorized users may withdraw funds from your accounts with the Debit Card, ExpressLine PIN, or Online Banking Password. You are obligated to repay any charges resulting from the use of your Card by authorized users, whether or not the person stays within any limits of use set by you. For example, if you give your friend your Debit Card in April to buy groceries and he/she uses it again in October to withdraw cash from an ATM, that transaction is considered authorized by you. The only way you can stop an authorized user from withdrawing funds from your accounts is to notify the Credit Union to cancel your Debit Card and de-activate your PIN, or to de-activate your ExpressLine PIN or Online Banking Password. You remain liable for any authorized use of your Debit Card or PIN or Password that occurs before you tell the Credit Union to cancel them.

**Credit Union Liability:** If we do not properly complete a transaction according to our agreement with you, we will be liable for your direct losses

or damages. However, there are some exceptions.

1. We will not be liable, if:
   (a) through no fault of ours, your account does not contain enough money, or you don't have available credit, to make the transaction;
   (b) the ATM where you are making the transaction does not have enough cash;
   (c) the equipment was not working properly and you knew about the breakdown when you started the transaction;
   (d) the money in your account is subject to legal process or other claim;
   (e) your Debit Card, PIN, ExpressLine PIN, or Online Banking Password has been reported lost, stolen or missing and we have blocked the account;
   (f) circumstances beyond our control such as fire, flood, electrical failure, or malfunction of the central data processing facility prevent the completion of the transaction despite our reasonable precautions; or
   (g) there are other lawful exceptions established by the Credit Union and you are given proper advance notice of them.

2. In no event will the Credit Union be liable for consequential, special, indirect or punitive costs or damages.

3. The Credit Union will carry out instructions given to us electronically, whether through the ATM, ExpressLine, Online Banking or a Point of Sale terminal, or in writing such as through a preauthorized transfer instruction or Debit Card signature transaction. We will not incur liability for doing so in a reasonable manner. You agree to defend, indemnify and save the Credit Union harmless from all costs, claims, damage, or liability which we sustain as a result of carrying out in a reasonable manner instructions received through ATM, POS terminal, signature transaction, ExpressLine, or Online Banking, from you or an authorized user.

4. The Credit Union may arrange for the availability of ATMs at various locations with access during non-business hours for the convenience of our members. However, ATM sites are not subject to our control. You assume the risk of using them since the Credit Union does not in any way warrant the security or safety of any location. The Credit Union is not responsible for wrongful acts committed by anyone who is not an authorized agent or employee of the Credit Union regarding your use of ATMs. The Credit Union will not be liable for consequential damage that you claim results from our failure to complete a transaction.

5. Remember, the best way to safeguard your PIN and Password is to store them only in your memory. Don't let anyone have them or see them. They are given to you as a convenience to you. Your careless-ness in keeping them any place where they can be identified and used by someone else to take money out of your accounts may expose you to loss of funds that your Credit Union will not cover.

6. *Security:* Avoid using ATM machines alone at night or at sites that appear to have the potential for assault or robbery. Put your money away and leave the site as soon as you have completed the transaction. Don't key your access code into the machine when someone is in a position to see the number.

**Privacy**

In the ordinary course of business regarding your EFTs, the Credit Union will disclose information to a third party about your account or the transfers you make: 1) where it is necessary for completing transfers; or 2) to verify the existence and condition of your account for a third party, such as a credit bureau or merchant; or 3) to comply with government agency or court orders; 4) if you give us your written permission, or 5) on closed accounts if we reasonably believe you mishandled your account. We will disclose information about you and your accounts to VISA USA and their agents if you have a Debit Card and use the VISA Assistance Center for emergency services. We will disclose information if we believe a third party such as a credit reporting agency or other entity has a legitimate reason for wanting the information. See the Credit Union's separate Privacy Policy for more information on the Credit Union's maintenance of the   privacy of membership information.

### Change in Terms - Cancellation

1. The Credit Union may change the terms of the Electronic Funds Transfer Agreement by mailing or delivering a written notice or amended agreement to you at your last known address on our records for the account. When we change this agreement, we will give you at least 21 days' written notice. You agree that we may immediately terminate this agreement and your use of Credit Union Debit Card, ExpressLine or Online Banking services without prior notice if any of the following occur: (a) you (or any authorized user of your Debit Card, or PIN code) breach this or any other agreement between us (including loan agreements); (b) we have reason to believe that there has been or may be an unauthorized use of your Debit Card, PIN code or Password; (c) there are conflicting claims to the funds; (d) you or any   authorized signer on your account requests us to do so; or (e) you withdraw funds at a time when funds are not available in your Credit Union accounts accessed under this program and you do not have a Credit Union checking overdraft protection agreement in effect with available funds or credit.

2. Your Debit Card is the property of the Credit Union and you agree to return it to us upon request.

3. If you want to change your Debit Card PIN you must bring both the Card and valid identification to any Credit Union branch for re-coding. ExpressLine PIN, or Online Banking Passwords can be changed by following the instructions given by ExpressLine or Online Banking.

### Delayed Deposits

Availability of funds deposited at ATMs may be delayed.  Please refer to the "FUNDS AVAILABILITY POLICY" section of this Handbook for details. In addition, you are responsible for not attempting to use EFT devices to withdraw funds before they become available. Reference to the FUNDS AVAILABILITY POLICY will help you comply with this rule.

### Additional Terms

1. Generally, ATMs may be accessed seven days a week; individual machines are sometimes closed temporarily for servicing.

2. Electronic Funds Transfer transactions may involve other Credit Union agreements, such as checking or loan agreements.  Wherever applicable, the terms of these agreements shall apply as well.

3. If an ATM is unable to complete a transaction three times in a row, usu-

ally because of the failure to key in the proper PIN, for your protection, the Debit Card may be retained by the ATM.

4. This agreement is governed by applicable law. If any provision of this agreement is found to be unenforceable, the rest of the agreement will remain in effect.

5. When you use your Debit Card, ExpressLine or Online Banking, you acknowledge receipt of this agreement and disclosure given to you with the card and/or PIN number and/or Password.

6. Business days are Monday through Friday. Holidays that fall on week-days are not considered business days. The Credit Union may be open to provide limited services on other days, but we do not consider those days "business days" as that term is used in this disclosure.

7. If your use of EFT services results in your becoming indebted to the Credit Union, and you do not pay what you owe us, you agree to pay reasonable collection costs we incur before we take legal action. If we have to take legal action to collect what you owe us, you agree to pay our reasonable attorney's fees and all costs we incur in taking the action in addition to what you owe us, whether the legal action we take is a collection lawsuit, a bankruptcy proceeding, an appeal, or another type of legal action.

8. The Credit Union can delay enforcing any of its rights under this Agreement without waiving them.

## IN CASE OF ERRORS OR QUESTIONS
## ABOUT YOUR ELECTRONIC TRANSFERS

If you think that an electronic transfer shown on your statement is wrong, or if you need more information about a transfer, contact us at the telephone number or address listed under the "HOW TO CONTACT US" section at the end of this disclosure. Please tell us all the information requested under the section entitled "WHAT TO TELL US IN CASE OF ANY ERROR OR INQUIRY."

We must hear from you no later than **sixty (60) days** after we sent you the **FIRST** statement on which the error or problem appeared. If you tell us orally, we may require that you send us your complaint or question in writ-ing **within ten (10) business days.** We will notify you of the results of our investigation **within ten (10) business days (twenty (20) business days for new accounts)** after we hear from you and will correct any error promptly.

If we need more time, however, we may take **up to forty-five (45) days (ninety (90) days for Point-of-Sale (POS) transactions or transactions involving foreign countries, or on new accounts)** to investigate your complaint or question. If we decide to do this, we will recredit your account **within ten (10) business days (twenty (20) business days for new accounts**) for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. If your complaint or question relates to a claim of unauthorized use of your VISA Debit Card and yours is not a new account, we will provisionally recredit your account **within five (5) business days**.

If we ask you to put your complaint or question in writing and we do not receive it **within ten (10) business days,** we may not recredit your account.

We will send you a written explanation **within three (3) business days** after we finish our investigation, whether or not we find that we made an error. You may ask for copies of the documents that we used in our inves-

ligation.

## DISPUTE RESOLUTION PROCESS AND ARBITRATION CLAUSE

By joining or maintaining membership in San Francisco Federal Credit Union, you agree that all disputes arising out of or related to accounts, loans or other services provided to you by the Credit Union will be resolved by binding non-judicial arbitration on an individual rather than a class basis. **Except as otherwise provided below, you may not bring any action against the Credit Union in court, and the Credit Union may not bring any action against you in court. Arbitration will be subject to the following rules and procedures.**

1. If you have a dispute about a product or service you obtained from the Credit Union that you are unable to resolve by working directly with a member of the Credit Union's staff, you may submit a Dispute Form. You can obtain this form on our web site at SanFranciscoFCU.com or ask a staff member for a Dispute Form.

2. If the Credit Union does not offer you a settlement that you accept or otherwise resolve your dispute to your satisfaction within 30 days after you submit a completed Dispute Form, you may submit a Demand for Arbitration. The Demand for Arbitration Form is available on the Credit Union's web site at SanFranciscoFCU.com or by request from a staff member.

3. Arbitration will take place before Judicial Arbitration and Mediation Services (JAMS) in its offices in or nearest to your county of residence, and be carried out consistent with then-current JAMS rules and standards for consumer arbitration.

4. One arbitrator will hear the dispute. He or she will be knowledgeable in substantive law that applies to the subject matter of the dispute. If you and we are unable to agree on the selection of an arbitrator, we will ask JAMS to appoint one for us.

5. For claims of $10,000 or less, you may choose whether the arbitration will be conducted in person, by telephone, or based solely on submission of written claims and supporting documents.

6. The arbitrator may order reasonable discovery.

7. The arbitrator can award any remedy that would be available to you in a court proceeding on an individual basis, including injunctive relief and punitive damages.

8. The Credit Union will pay all arbitration fees unless the arbitrator makes a finding that your claim was frivolous. If the arbitrator finds that your claim was frivolous, the arbitrator has discretion to require you to pay all or part of the arbitration fees.

9. The Credit Union will bear its own attorneys' fees in all disputes submitted to arbitration.

10. If the arbitrator makes an award to you that exceeds the Credit Union's last written offer of settlement to you, the Credit Union will pay you the greater of (a) $7,500.00 or (b) the amount awarded by the arbitrator, plus (c) twice the amount of your attorneys' fees.

11. The arbitrator's award will be final, binding, and not subject to appeal unless the arbitrator's findings of fact or conclusions of law are clearly erroneous. The arbitrator's award may be entered as a judgment in a court of competent jurisdiction.

For disputes under $7,500 or the then-current maximum jurisdiction of the small claims courts in the states in which you reside, you or we can elect the arbitra-

tion proceeding outlined above or pursue the claim(s) in small claims court on an individual (non-class) basis.

This dispute resolution provision does not apply to extra judicial procedures available to the Credit Union at law or in equity to take possession of real or personal property that you have pledged to secure loan repayment obligations to us.

## HOW TO CONTACT US

Call: **415.775.5377** or outside 415  Call: **800.852.7598**

Fax: **415.775.5340**

TDD: **415.615.7033**

*Main Office Business Hours:*
| | |
|---|---|
| Mon-Wed, Fri | 8:30 a.m. to 5:30 p.m. |
| Thursday | 10:00 a.m. to 5:30 p.m. |
| Saturday | Closed |
| Sunday | Closed |

*Branch Business Hours: (Call 415.775.5377 or visit*
*SanFranciscoFCU.com for specific branch hours.)*

**You may write to us at:**
San Francisco Federal Credit Union
770 Golden Gate Avenue
San Francisco, CA 94102

**You may email us at:**
contacts@SanFranciscoFCU.com

**Locations:**
For a complete list of branch locations, visit our website or call us.

**Website:**
SanFranciscoFCU.com

**To report a Lost or Stolen VISA® Debit / Credit Card During Business Hours, call:**
415.775.5377, option 4.

**To report a Lost or Stolen VISA® Debit Card After Business Hours, call:**
888.241.2510

**To report a Lost or Stolen VISA® Debit Card After Business Hours Outside the US, call collect:**
909.941.1398

**To report a Lost or Stolen VISA® Credit Card After Business Hours, call:**
800.682.6075

## WHAT TO TELL US IN CASE OF ANY ERROR OR INQUIRY

**(1) Tell us your name;**

**(2) account number;**

**(3) describe the error or the transfer about which you are unsure;**

**(4) explain, as clearly as you can, why you believe there is an error;**

**(5) tell us the dollar amount; and,**

**(6) the date in question.**

© 2015 Greene & Allison LLP. All rights reserved.

Federally insured by NCUA



1511-00721 2.5M

**EXHIBIT C**

# SAN FRANCISCO
## FEDERAL CREDIT UNION

**San Francisco Federal Credit Union**
**Schedule of Fees and Charges**
*Effective September 1, 2017*

## Account Maintenance and Activity Fees

| | |
|---|---|
| Checking: Check, ACH or Bill Pay Payment Returned for Insufficient Funds | $25.00 per item, $100.00 daily maximum  per transaction type; $300.00 total daily maximum |
| Checking: Check, ACH or Bill Pay Payment (or Debit Card purchase transaction with opt-in) Paid Against Insufficient Funds * | $25.00 per item, $100.00 daily maximum per transaction type; $300.00 total daily maximum ($400.00 total daily maximum with Debit Card purchase transaction opt-in) |
| Checking: Check Printing | Varies. (1 free box per year of Credit Union image checks with Park or Bridge Benefits) |
| Checking: Overdraft Advance from Credit Line | Free (interest is assessed on credit line) |
| Checking: Overdraft Transfer from Savings | Free (six per month maximum) |
| Checking: Stop Payment or Post Dating Order | $15.00 each |
| Checking: Stop Payment on a Single Check or Series of Check Numbers | $25.00 each |
| Checking: Temporary Checks | $4.00 per set |
| Checking/Visa: Paper Copies of Paid Checks | 2 free per month, then $2.00 each |
| Health Savings:  Monthly Maintenance | $1.00 (waived during first year and with Bridge Benefits) |
| Incoming Wire Transfer (All Accounts) | $10.00 each (waived with Bridge Benefits) |
| IRA: Premature Distribution | $12.00 each |
| IRA: Transfer to Another Institution | $20.00 each |
| Money Market Yield Account Maintenance Fee | $5.00 per month (waived with average daily balance of $2,500) |
| Outgoing Wire Transfer (Domestic Only) | $20.00 each ( waived with Bridge Benefits) |
| Savings: Excess Personal Withdrawals | $3.00 each (waived with Bridge Benefits) |

## Electronic Fund Transfer Fees

| | |
|---|---|
| ATM: CO-OP Network ATM Withdrawal and Deposit | Free |
| ATM/Debit Card Transaction Slip Copy | $10.00 |
| ATM: Deposit Error Adjustment | $5.00 |
| ATM: San Francisco FCU ATM Withdrawal and Deposit | Free |
| Automated Clearinghouse (ACH) Stop Payment | $25.00 |
| Debit Card Transaction in Foreign Currency | 1% of U.S. Dollar amount |
| Debit Card U.S. Dollar Transaction in Foreign Country | 0.8% of U.S. Dollar amount |
| Online Bill Pay: Copy of Bill Payment Check | $20.00 each |
| Online Bill Pay: Overnight Payment Fee | $25.00 each |
| Online Bill Pay: Stop Payment of Bill Pay Check | $25.00 each |
| Point-of-Sale ATM/Debit Card Transaction | Free (merchant fees may be assessed) |

## Special Service and Handling Fees

| | |
|---|---|
| Account History Printout | $5.00 (waived with Bridge Benefits) |
| Account Research | $25.00 per hour, 1 hour minimum, plus copy charges $2.00 per standard-size page, and actual cost of non-standard document copies and offsite document retrieval |
| Address Locator Service | $5.00 |
| Bill Payment (not through online banking) | $3.00 per bill |
| DMV Documentation and Transfer | $20.00 |
| Duplicate Statement for non-current month | $2.00 each (waived with Bridge Benefits) |
| Escheat Notice | $2.00 |
| Expedited Delivery | Actual Cost $15.00 minimum |
| Immigration and Naturalization Service Letter | $5.00 (waived with Bridge Benefits) |
| Incoming Collection (items payable in foreign currency) | $15.00 |
| Levy or Writ Processing | $25.00 |
| Outgoing Collection (items payable in foreign currency) | $15.00 plus third party fees |
| Paper Statements (mailed, excluding first mortgage or fixed-rate home equity loans) | $2.00 per month (waived for Bridge Benefits, primary members age 60 or older, primary members age18 and under, or UTMAs) |
| Photocopy of Transaction Document | $2.00 per document (waived with Bridge Benefits) |
| Reclamation of Escheated Funds | $10.00 |
| Refund/Replacement of Teller Check | $10.00 |
| Returned Deposit Item if deposited at ATM | $20.00 |
| Returned Deposit Item if drawn by owner of account of deposit and deposited at a non-ATM location | $25.00 |
| Returned Deposit item if drawn by a third party and deposited at a non-ATM location | $10.00 |
| Returned Loan Payment | $25.00 |
| Rolled Coins | 10 free rolls per transaction, then $0.10 per roll |
| Same-Day Payroll/Government Check Cashing | 2% of check amount; $5.00 minimum (waived with Bridge Benefits) |
| Shared Branch Checking and Savings Transactions | Free (other credit unions may charge fees for use of their branches) |
| Teller Check Payable to Third Party | $5.00 each (waived with Park or Bridge Benefits) |
| Verification of Deposit | $10.00 each (waived with Bridge Benefits) |

Benefit Levels: $100 average daily balance = Avenue Benefits. $5,000 average daily balance = Park Benefits. $10,000 average daily balance = Bridge Benefits. If you have a San Francisco FCU first mortgage or fixed-rate home equity loan you automatically qualify for Bridge Benefits. Benefit Level Calculation: The current month's benefit level is based on the previous month's combined average daily balance of accounts (savings, checking, certificate, IRA) and outstanding loans under the same core member number. (Loan balance calculation excludes balances on loans past due more than 32 days, unused credit limits, and first mortgages and fixed-rate home equity loans.) *Unless the checking account owner has arranged in advance to cover overdrafts via savings transfer or line of credit advance and has available funds or credit at the time an item is presented against insufficient funds, payment of items against insufficient funds is a service provided at the Credit Union's sole discretion and is never guaranteed. Items will not be paid against insufficient funds if the checking account has not been open for at least 90 days, if any checking account owner is in default on other obligations to the Credit Union, if the checking account does not receive regular deposits, or if in the Credit Union's judgment the account has experienced excess overdrafts. Negative balances resulting from payment of items presented against insufficient funds must be restored within 45 days. Federally insured by NCUA.

Revised October 12, 2018